**LEAR SIEGLER, INC., ENERGY PRODUCTS DIVISION,**
Plaintiff–Appellee/Cross Appellant,

v.

**John LEHMAN, Secretary of the Navy, et al.,**
Defendants–Appellants/Cross–Appellees.

**LEAR SIEGLER INC.,**
Plaintiff–Appellee,

and

**United States Senate; United States House of Representatives,**
Plaintiffs–Intervenors–Appellees,

v.

**John LEHMAN, Secretary of the Navy; William Stevenson, Contracting Officer,** Defendants–Appellees.

Nos. 86–6496, 87–5698 and 87–5670.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 1987.

Decided March 23, 1988.

Peter B. Jones, Foster, Jones & Donovan, Irvine, Cal., for the plaintiff-appellee/cross appellant.

Harold J. Krent, U.S. Atty., Dept. of Justice, Washington, D.C., for defendants-appellants/cross-appellees.

Morgan J. Frankel, Asst. Senate Legal Counsel, Washington, D.C., for plaintiffs-intervenors-appellees.

Before FLETCHER and FARRIS, Circuit Judges, and QUACKENBUSH,* District Judge.

* Honorable Justin L. Quackenbush, United States District Judge for the Eastern District of Washington, sitting by designation.

FLETCHER, Circuit Judge:

This appeal arises out of the Executive Branch's constitutional challenge to legislation regulating procedures for the award of procurement contracts by federal agencies. The government defendants (the Navy) maintain that the Competition in Contracting Act of 1984 (CICA), Pub.L. No. 98-369, 98 Stat. 1199, 31 U.S.C. §§ 3551-3556, is unconstitutional to the extent that it allows the Comptroller General to determine the length of stays or suspensions of government contract awards when contracts are protested. The challenged provisions, it is argued, give "executive" powers to an officer of the legislative branch, and are therefore unconstitutional. The district court granted summary judgment, upholding CICA's constitutionality, and awarded attorneys' fees against the Navy in favor of Lear Siegler, Inc., Energy Products Division (Lear Siegler), on the ground that the Navy's intentional refusal to adhere to the challenged provisions of CICA unjustifiably forced Lear Siegler to litigate the issue. The Navy appeals both issues.

Lear Siegler cross-appeals from the district court's grant of summary judgment to the Navy denying Lear Siegler's bid protest. According to Lear Siegler, the Navy failed to follow applicable procurement regulations in awarding the contract to Lear Siegler's competitor.

For the reasons set forth below, we affirm the judgment of the district court.

## BACKGROUND

CICA was enacted as part of the Deficit Reduction Act of 1984 to stem the persistent and costly use of "sole-source" or noncompetitive contract awards made by federal agencies, particularly in the defense area. The Act was meant to compel greater use of fair, competitive bidding procedures "by shining the light of publicity on the procurement process, and by creating mechanisms by which Congress can remain informed of the way current procurement legislation is (or is not) operating." *Ameron v. U.S. Army Corps of Engineers*, 809 F.2d 979, 984 (3rd Cir.1986) ("*Ameron II*").

CICA establishes a system by which the General Accounting Office, or Comptroller General, can investigate protests lodged by frustrated bidders claiming agency failure to adhere to competitive procedures. The Comptroller General, upon receipt of a protest, notifies the agency concerned and investigates the matter, finally issuing a non-binding recommendation to the agency on the procurement decision. CICA sets forth detailed reporting requirements and deadlines that formalize an existing "bid protest" system with a few important modifications. The modification central to this dispute is that CICA imposes an automatic stay or suspension of any contract award or performance once a bid protest is timely lodged. An award may not be made, or

* Honorable Justin L. Quackenbush, United States District Judge for the Eastern District of Wash- · ington, sitting by designation.

performance resumed, "while the protest is pending." 31 U.S.C. § 3553(c)(1) & (d)(1). The protest is pending for as long as it takes the Comptroller General to investigate and reach a decision. The Comptroller General may dismiss frivolous protests right away, but may take up to 90 working days, as needed; moreover, the Comptroller General may take more than 90 days, if circumstances require and written reasons are given. § 3554. On the other hand, the procuring agency may override the stay at any time "upon a written finding that urgent and compelling circumstances which significantly affect the interests of the United States will not permit waiting for the decision of the Comptroller General." § 3553(c)(2)(A).

The stay provisions were designed to preserve the status quo until the Comptroller General issued his recommendation, in order to ensure that the recommendation would be considered. Under prior practice, procuring agencies had tended to exploit loopholes in earlier stay regulations; they would rush into contract awards and get performance underway so that, by the time the Comptroller General's recommendation came out, it would be too late and too costly to change contract awards, if such was the recommendation. House Comm. on Government Operations, *The President's Suspension of the Competition in Contracting Act is Unconstitutional,* H.R.Rep. No. 138, 99th Cong., 1st Sess. 4–5 (1985) (hereinafter cited as *"House Report"*). The Navy argues that the stay provisions are unconstitutional to the extent that the length of the stay is determined, in effect, by the Comptroller General's discretion in taking the time he needs to issue his report.

When President Reagan signed CICA into law, he objected to the stay provisions as an unconstitutional attempt to delegate to the Comptroller General, an officer of Congress, duties that may only be performed by executive officials. At the Attorney General's direction, the Office of Management and Budget issued a directive requiring agencies to disregard the stay provisions of CICA. *House Report,* at 5–7. In connection with the *Ameron* case, the Attorney General stated on April 18, 1985 that the executive branch would not comply with a district court order upholding CICA, nor even possibly a court of appeals decision. *Ameron v. U.S. Army Corps of Engineers,* 787 F.2d 875, 889–90 (*"Ameron I"*), *modified,* 809 F.2d 979 (3d Cir.1986).

It was against this background that the instant case arose. Lear Siegler placed a sealed bid with the Navy in response to a bid solicitation for a contract to provide fuel tanks for the Navy F/A–18 aircraft. When the bids were opened publicly on November 15, 1984, the two lowest bidders were Lear Siegler ($6,910,479), and Israel Military Industries (IMI) ($5,125,788). In January 1985, in response to a request by the Israeli government, the Navy exercised its discretion to "waive" a penalty factor provision of the Buy American Act, 41 U.S.C. § 10a, which required foreign contractor bids to be calculated with a 50% upward adjustment. Believing the waiver to be improper, Lear Siegler filed a bid protest with the GAO on February 14, 1985. This protest should have automatically stayed a contract award under CICA. Nevertheless, pursuant to the Reagan Administration's announced position, the Navy disregarded CICA's stay provisions and awarded the contract to IMI on February 19, 1985.

Immediately thereafter, Lear Siegler filed this action in district court seeking 1) declaratory and injunctive relief to compel the Navy's compliance with CICA, and 2) a court ruling on the merits of its bid protest. The U.S. Senate filed a complaint as intervenor, on March 5, 1985, for declaratory and injunctive relief upholding the validity of the CICA stay provisions. The Comptroller General and the House of Representatives subsequently joined as intervenors. None of the intervenors took, or now take, any position as to the merits of Lear Siegler's bid protest. The GAO issued a decision rejecting the bid protest on April 8, 1985.

On November 21, 1985, the district court granted the Senate's motion for summary judgment, upholding the constitutionality of CICA. However, the court's rationale

was in part undercut by the Supreme Court's subsequent holding in *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), that the Comptroller General is an agent of the legislative branch. The district court reconsidered the issue and again upheld the challenged provisions, on the ground that the Comptroller General's CICA functions were not "executive" under *Bowsher.* The court also rejected Lear Siegler's bid protest on the merits, but granted attorneys' fees to Lear Siegler for its success on the constitutional issue.

## I. CONSTITUTIONALITY OF CICA'S STAY PROVISIONS

### A. *Analytical Framework*

We examine the separation-of-powers issue in light of the principles set forth in *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), and *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). According to the Navy, *Chadha* and *Bowsher* compel the conclusion that Congress may not "vest one of its officers or component parts with the power to affect the rights of those outside the legislative branch," and, thus, the Comptroller General cannot discharge the "executive" tasks assigned by CICA.

In *Bowsher v. Synar,* the Supreme Court struck down certain provisions of the Gramm–Rudman–Hollings Act as violating separation of powers. Ruling that the Comptroller General was an officer of the legislative branch, 106 S.Ct. at 3191, the Court held that it was unconstitutional for Congress to grant the Comptroller General certain budget-cutting powers which the Court found to be "executive" in nature. According to the Court, Congress cannot "execute the laws" or delegate to an officer under its control the power to execute the laws. *Id.* at 3188. The Court went on to define the "essence of 'execution' of the law" as interpreting and implementing the legislative mandate, or "exercis[ing] judg-

ment concerning facts that affect the application" of the law. *Id.* at 3192.

While *Bowsher v. Synar* provides broad, foundational principles to guide our inquiry in this case, we must nevertheless be careful not to pull the *Bowsher* language out of context. For instance, *Bowsher's* definition of "execution of the law," standing alone, would seem to prohibit any employee of the legislative branch from acting pursuant to an act of Congress. *See Ameron II,* 809 F.2d at 990 (Congress and judiciary implement legislation in administering their respective branches); Elliot, *Regulating the Deficit after* Bowsher v. Synar, 4 Yale J.Reg. 317, 326 (1987) ("In a government of laws, by definition, *every* employee of the government must 'interpret' laws and 'exercise judgment concerning facts' to apply the law to specific situations.").[1] Such an interpretation would invalidate all of the Comptroller General's functions, a result which did not seem to be contemplated in *Bowsher v. Synar* and which would in effect overrule prior Supreme Court approval of the Comptroller General's implementation of "the GAO's mandate to detect fraud, waste, inefficiency, and extravagance through full audits of Government contracts." *Bowsher v. Merck & Co.,* 460 U.S. 824, 844, 103 S.Ct. 1587, 1599, 75 L.Ed. 2d 580 (1983).

To avoid this obviously absurd result, the Navy attempts to qualify the language it selects from *Bowsher v. Synar* by grafting onto it certain language from *INS v. Chadha.* In *Chadha,* the Court struck down a "legislative veto" provision of the Immigration and Nationality Act by which the House of Representatives could overrule the Attorney General's discretionary decision under the Act to suspend an alien's deportation. The Court held that Congress may not take "action that ha[s] the purpose and effect of altering the legal rights, duties and relations of persons, including [private parties and executive branch officials], all outside the legislative branch,"

---

**1.** A literal-minded interpretation of this language from *Bowsher* would also redefine judicial functions, which involve interpreting law, exercising judgment about facts, and issuing binding decisions, as "executive." *Ameron II,* 809 F.2d at 990; Elliot, *supra,* 4 Yale J.Reg. at 326.

462 U.S. at 952, 103 S.Ct. at 2784, without going through the Article I procedure for enacting legislation—bicameral passage and presentment to the President. *Id.* at 952, 958–59, 103 S.Ct. at 2784, 2787. Stated another way, Congress cannot control the execution of its enactments except "indirectly—by passing new legislation." *Bowsher v. Synar*, 106 S.Ct. at 3192 (citing *Chadha*, 462 U.S. at 958, 103 S.Ct. at 2787).

The Navy urges us, in essence, to put these abstracted phrases from *Chadha* and *Bowsher* together to create a seemingly reasonable rule that Congress and its agents are forbidden from "executing the law" only where doing so affects actors outside the legislative branch. This approach finds superficial support in language from *Bowsher* equating the unconstitutional provision there with the unconstitutional provision in *Chadha*: "To permit an officer controlled by Congress to execute the laws would be, in essence, to permit a congressional veto.... This kind of congressional control over the execution of the laws, *Chadha* makes clear, is constitutionally impermissible." *Bowsher*, 106 S.Ct. at 3189.

The Navy's grafting approach suffers from two flaws. First, the Supreme Court did not resolve *Bowsher v. Synar* by resort to a formalistic application of the language from *Chadha*. Instead, in order to give meaning to its definition of "execution of the law," the Supreme Court analyzed the specific provision of Gramm–Rudman–Hollings which appeared to authorize the Comptroller General to direct the president to implement budget cuts determined by the GAO. In *Bowsher*, "the executive nature of the Comptroller General's functions under the act is revealed in § 252(a)(3) which gives the Comptroller General *the ultimate authority* to determine the budget cuts to be made." 106 S.Ct. at 3192 (emphasis added). *Bowsher*, in essence, defines "execution of the law" as not merely interpreting and implementing a legislative mandate but also exercising ultimate authority over, or directing, an executive official. The Third Circuit, in *Ameron II*, agrees with this reading of *Bowsher*. 809 F.2d at 990. It makes far more sense to interpret the *"Bowsher* Rule" in light of what that case held than, as the Navy urges, in conjunction with the Navy's distillation of the *"Chadha* Rule."

The second flaw in the Navy's approach is that the rule it extracts from *Chadha* is also problematic when divorced from its context. The Navy directs our attention to whether the action in question "alter[s] the legal rights, duties and relations of persons...." In *Chadha*, the action in question was the House of Representatives' decision to overrule the Attorney General's suspension of Chadha's deportation and, in effect, to order Chadha deported. The House thus attempted to make a final disposition of Chadha's rights in the deportation proceeding and to impose on the Attorney General a duty to carry out that directive. In this sense, *Chadha* involved an exercise of "ultimate authority" over an executive officer, as in *Bowsher*. See 106 S.Ct. 3192; *see also American Federation of Gov't Employees v. Pierce*, 697 F.2d 303 (D.C.Cir.1982) (striking down one-house veto provision whose exercise could permanently block expenditure of appropriated funds by executive agency). To the extent that such "alteration of legal rights and duties" is "execution of the laws," it appears that the action must be in the nature of a final disposition by the legislative agent or a directive to the executive actor to carry out the final disposition.

Contrary to this implication in *Chadha* and *Bowsher*, the Navy takes the position that "altering legal rights and duties" refers to any action that forces the parties outside the legislative branch to alter their position in any way.

> The Comptroller General's exercise of [the stay] power unquestionably binds both contractors and procuring agency.... [T]he contractor cannot perform the contract (and indeed, it may well suffer additional costs due to delay), and the agency is delayed from accomplishing its contractual goal.

Reply Brief at 18.

> [Legislative] agents cannot take part in execution of laws in such a way that

*directly affects* operation of coordinate branches of government or private persons. Here, the Comptroller General's determinations bind the Executive Branch and contractors *by fixing the time for execution* of the contract.

Opening Brief at 23 n. 14 (emphasis added). Not only does this position represent an extension of the concept of altering legal rights as an act of final disposition, *see Chadha,* 462 U.S. at 952–54, 103 S.Ct. at 2784–85; *see also Bowsher,* 106 S.Ct. at 3192; *AFGE v. Pierce,* 697 F.2d at 306, but it also leads to unreasonable results in light of clearly constitutional exercises of power by the legislative branch. For example, the congressional power to issue subpoenas to coerce testimony before investigative committees, without resort to legislation, is not in doubt. Yet it is also true that such activity "binds" and "directly affects" parties outside the legislative branch. *See Ameron II,* 809 F.2d at 992. Witnesses who must appear to testify, often finding it necessary to hire legal counsel, may be no less put out in terms of lost time and money than a contractor whose contract performance is stayed. Thus, the Navy's argument—in effect, that persons' legal rights, duties and relations are unconstitutionally altered whenever a legislative agent causes them some inconvenience in terms of time and money—proves too much.

■ In sum, the Navy has presented this court with an unacceptable and unworkable formulation of "executive power in the constitutional sense," *Humphrey's Executor v. United States,* 295 U.S. 602, 628, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935), power that it asserts the legislative branch and its agents cannot exercise. The appropriate formal test must instead be derived from reading the principles of *Chadha* and *Bowsher* in light of the facts of those cases. Such a reading suggests improper congressional action to be the exercise of ultimate authority over an executive official, or a final disposition of the rights of persons outside the legislative branch. Put another way, the critical issue is whether Congress or its agent seeks to *control* (not merely to "affect") the execution of its

enactments without respect to the Article I legislative process. *See Bowsher,* 106 S.Ct. at 3192. If Congress "in effect has retained control," its action and the statutory provision on which it is based is unconstitutional. *Id.*

This formulation of the relevant inquiry is preferable to that offered by the Navy. Confusion is bound to result from any simplistic attempt to define acts as "legislative" or "executive" and then confine those acts to the branches that bear the name. For example, when Congress acts "with the purpose or effect of altering rights of persons ... outside the legislative branch" it is (or should be, constitutionally) legislating. *See, e.g., Chadha,* 462 U.S. at 933, 935 n. 8, 103 S.Ct. at 2774, 2776 n. 8 (Congress had suspended deportation of individuals by legislation and, presumably, could deport individuals by legislation). But if an executive officer acts with the same purpose and effect (e.g., deporting an alien) the act is executive. But what if the *Comptroller General* had ordered Chadha's deportation pursuant to a legislative mandate, thereby acting with the purpose and effect of "altering legal rights of persons ... outside the legislative branch"? Is he, as a subdelegee of legislative power within the legislative branch, attempting to "legislate" without bicameral passage of a bill through Congress and presentment to the President, as in *Chadha*? Or is he "executing" the law, under *Bowsher*? The characterization of the Comptroller General's hypothetical act as "legislative" or "executive" will not determine whether that act is constitutional. We are apt only to mislead ourselves by asking whether a particular act is, in its essence, "legislative" or "executive."

The analysis cannot end with this formal test. Even if the challenged sections of CICA do not constitute attempted *control* of the executive's role under the statute, they may still pose a potential disruption of the executive's function that must be balanced against Congress's "need to promote objectives within [its] constitutional authority." *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777,

2790, 53 L.Ed.2d 867 (1977); *see Commodities Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 3261, 92 L.Ed. 2d 675 (1986) (where Congress has not aggrandized its own power at expense of coordinate branch, relevant inquiry is whether Congress has "impermissibly undermined" role of coordinate branch); *Ameron II*, 809 F.2d at 996.

## B. CICA's Stay Provisions as Execution of the Procurement Laws

■ It is important to notice what aspects of CICA the Navy challenges. The Navy does not challenge Congress's plenary authority to pass laws governing the procurement process. Indeed, there is "no authority or reason that Congress could not, through legislation, dictate exactly what the [executive branch] must purchase, from whom, and at what price." *Ameron II*, 809 F.2d at 991. The Navy correctly concedes that Congress also has authority to impose an automatic stay upon a procurement action, for whatever period it rationally determined proper. *See Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941) (upholding automatic report-and-wait provisions enabling Congress to review newly promulgated Federal Rules of Civil Procedure); *Chadha*, 462 U.S. at 935 & n. 9, 103 S.Ct. at 2776 & n. 9 (upholding two-year waiting period for cancellation of alien's deportation proceedings). In addition, a report-and-wait provision is proper even if the time is used by congressional committee members to pressure an executive official to alter a procurement decision. *See City of Alexandria v. United States*, 737 F.2d 1022, 1026 (Fed.Cir.1984). Finally, despite its overbroad formulation of the limitations on permissible activities of legislative agents, the Navy concedes that the Comptroller General has authority to issue non-binding recommendations on bid protests. There is no doubt that Congress constitutionally can act, without recourse to the full legislative procedure of bicameral passage and

presentment, to investigate the conduct of executive officials and others outside the legislative branch; to seek to influence the executive through its opinions, as articulated by concurrent resolutions without presentment to the president; and to influence the executive through "the illuminating power of investigation." *Ameron II*, 809 F.2d at 992 (and authorities cited therein). This investigatory power is inherent in the legislative process, *Watkins v. United States*, 354 U.S. 178, 187, 77 S.Ct. 1173, 1179, 1 L.Ed.2d 1273 (1954), and it may be delegated to the Comptroller General. *See Bowsher v. Merck & Co.*, 460 U.S. at 844, 103 S.Ct. at 1598.

The Navy challenges only those provisions of CICA which condition the duration of the stay upon actions taken by the Comptroller General. Specifically, 31 U.S.C. §§ 3553(c)(1) and (d)(1) suspend, respectively, a contract award or, if an award has been made, performance of a contract once the Comptroller General notifies the procuring agency that a bid protest has been lodged. The suspension, or stay, lasts as long as the protest is pending and ends when the Comptroller General issues its final determination and recommendation on the bid protest, even if the decision disapproves the contract award. 31 U.S.C. § 3554.[2] The statute directs the Comptroller General to issue his decision in no more than 90 working days from the submission of the bid protest. However, the Comptroller General may issue his decision sooner, pursuant to the statutory command to "provide for the inexpensive and expeditious resolution of protests," § 3554(a)(1), may establish an "express option" for deciding suitable cases within 45 days, and may summarily dismiss protests which are frivolous. § 3554(a)(3). On the other hand, the Comptroller General may take longer than 90 working days if he "determines and states in writing his reasons that the specific circumstances of the protest require a longer period." § 3554(a)(1).

---

2. However, the Comptroller General may order the procuring agency to pay a prevailing bid protester's fees and costs. § 3554(c)(1). In addition, the procuring agency is required to respond to the Comptroller General's recommendations in writing within 60 days. The Navy does not challenge the constitutionality of these provisions in this case.

The Navy argues that these provisions effectively grant the Comptroller General the discretion to determine the length of the stay. This discretion to delay—indefinitely, if reasons are provided—the award or implementation of procurement contracts is at the core of the argument that CICA impermissibly interferes with the executive's delegated authority over procurement.

In addressing this issue, the Third Circuit aptly summarized *Chadha* as holding that "once Congress has delegated authority to the executive, the executive must be allowed to operate freely within the sphere of discretion created for him by that legislation." *Ameron II*, 809 F.2d at 993. Thus, the constitutional infirmity in *Bowsher* was that, having delegated budget cutting authority to the president in Gramm–Rudman–Hollings, "Congress then obliged the exercise of that discretion according to the dictates of the Comptroller General." 809 F.2d at 994. CICA, by contrast, did not "g[i]ve power to the executive and then [take] it back", by allowing Congress to wield powers given to the executive. CICA, in fact, empowered the executive to override the Comptroller General's stay, without giving the Comptroller General any authority to limit the executive's override power. *Id.*

In the instant case, the district court took a slightly different approach by reasoning that the power to shorten or lengthen a stay is merely an "incidental effect" of the Comptroller General's legitimate authority to issue non-binding recommendations. The district court's resolution of this issue follows the language in *Chadha*, that the improper action must have "the *purpose and effect*" of altering rights and duties. 462 U.S. at 952, 103 S.Ct. at 2784 (emphasis added). Because the stay operates as an incident to the Comptroller General's decision-issuing power, it cannot be said, formally speaking, that his challenged action

has the "purpose" of staying the contract. On the contrary, the stay provisions were designed by Congress to enable the Comptroller General to issue his decision before the procuring agency could make the challenged contract a *fait accompli*.[3]

Although we agree with their results, we do not adopt the reasoning advanced by either the Third Circuit in *Ameron II* or the district court in this case. The problem with *Ameron II*'s reasoning—that CICA does not grant and then take back power—emerges when one looks at the procurement laws as a whole. As argued by the Navy, Congress has elsewhere delegated to the executive various powers over procurement, which are taken back by the stay power in CICA. Although neither *Chadha* nor *Bowsher* look beyond the powers delegated by the challenged statutes, there is some force to the argument that the relevant inquiry is not confined to that power delegated by the statute in question. The district court's rationale in this case is not fully persuasive either, because its focus on the "purpose" of the challenged action does not resolve the real problem: whether CICA gives the Comptroller General discretionary control over executive agents.

■ As outlined above, the proper inquiry is not whether a legislative agent can temporarily "bind" or "directly affect" parties outside the legislative branch, but rather whether the legislative agent exercises *control* or ultimate authority in the disposition of a particular issue. It is clear that the stay provisions do not establish such control. As noted above, the stay is temporary, usually 90 working days or less. Because the recommendations of the Comptroller General are non-binding, the stay cannot be used to coerce the procuring agency to make a particular final disposition; rather the stay provisions force nothing more than a dialogue between the procuring agency and the legislature. *Ameron II*, 809 F.2d at 986.[4]

---

**3.** The Navy's suggestion that *Congress's* "purpose" in enacting CICA was to stay the contracts is irrelevant to this inquiry. Congress enacted CICA according to the constitutionally prescribed means of bicameral passage and presentment. It is not Congress's act of passing

CICA that is challenged here, but rather the Comptroller General's actions under CICA.

**4.** As long as the stay period is reasonably finite, this point applies whether the stay is shortened or lengthened incident to the Comptroller Gen-

In deciding whether to extend or shorten a stay, the Comptroller General is authorized to consider only the length of time needed to decide the bid protest; he is not authorized to consider the importance or wisdom of the purchase decision. Further, the stay is initiated not by the Comptroller General, but by a bid protester. *Ameron II*, 809 F.2d at 994. It is true that the terms of the statute impose no time limit on the Comptroller General's decision-making, other than his good faith reasons for extending the time. Were the Comptroller General thus able to stay a procurement contract indefinitely, a serious issue of his control over procurement would be raised. But the statute addresses this problem by granting the procuring agency the power to override the stay by issuing a written finding that "urgent and compelling circumstances which significantly affect the interests of the United States will not permit waiting for the decision of the Comptroller General." § 3553(c)(2). This provision lodges ultimate authority over the timing of the contracts with the executive branch and obviates the problem of an indefinite stay.

Because the stay provisions do not vest the Comptroller General with ultimate control over the executive and other persons outside the legislative branch, they are not unconstitutional under *Chadha* and *Bowsher*.

## C. CICA's Interference with the Executive's Procurement Function

■ Although we find that the challenged stay provisions of CICA do not control or "execute" the procurement laws, and that they constitute a legitimate exercise of congressional authority, we nevertheless must consider the potential interference of CICA with the legitimate exercise of the procurement powers delegated to the executive branch. The potential for disruption of executive functions must be balanced against Congress's need to promote objectives within its constitutional authority. *See Nixon v. GSA*, 433 U.S. at 443, 97 S.Ct. at 2790; *CFTC v. Schor*, 106 S.Ct. at 3261; *Ameron II*, 809 F.2d at 995–96.

In the instant case, the potential disruption of executive functions stems from delays in the award and performance of government contracts.[5] In addition, procuring agency officials, leery of the prospect of stays, may be encouraged to make procurement decisions that would reduce the likelihood of lengthy investigations by the Comptroller General. *See Ameron II*, 809 F.2d at 995.

Balanced against this effect on procurement decisionmaking and timing of contract performance is the congressional interest in responding to a long term problem in government spending. For many years, seemingly in vain, Congress has required Federal agencies to award procurement contracts on the basis of competitive bidding rather than "sole-source" contracting —relying over time on a single contractor. In fiscal year 1983, for example, only $54 billion of $168 billion in government contracts were competitively awarded. *House Report*, at 4. Although an informal "bid protest" procedure had been followed for several years prior to CICA, *id.; see Wheelabrator Corp. v. Chafee*, 455 F.2d 1306, 1313–16 (D.C.Cir.1971), the procedure was rendered ineffectual by procuring agencies' manipulations. Essentially, the procuring agencies would rush to award contracts and begin performance before the Comptroller General issued his recommendation, by which time it would be too costly to undo the contract and award the contract to a successful bid protester. *House Report*, at 4–5; *see Aero Corp. v.*

---

eral's actions. Admittedly, the "intrusion" on the executive branch is greater when the stay is lengthened. Formally, however, stay-lengthening power does not, without more, rise to the level of control. To the extent that this intrusion should be considered, it must be weighed against Congress's need to promote legitimate legislative objectives. *See* Section C, *infra*.

**5.** As noted above, CICA also requires written responses by heads of procuring agencies to the Comptroller General's report, and empowers the Comptroller General to impose fee awards upon the agencies. However, these elements of CICA are independent of the challenged stay provisions.

*Dept. of Navy,* 540 F.Supp. 180, 215 (D.C. Cir.1982); *Ameron II,* 809 F.2d at 985. The stay provisions in CICA are intended to close this loophole by preserving the status quo while the Comptroller General prepares and issues his report.[6]

The limited nature of the intrusion by CICA's stay provisions into the executive branch was well summarized by the Third Circuit in *Ameron II:*

1. The initial stay is short. Even if the acquiring agency were to change a procurement decision in order to avoid or to cut short a bid protest, it would not stand to gain so much time that the temptation to do so would have a significant impact on the agency's purchase decision.

2. CICA does not authorize the Comptroller General to extend the stay any longer than necessary to decide a bid protest. We cannot envision circumstances, and none have been suggested to us, when this time could be long enough to constitute a significant impediment to the President's execution of the procurement laws.

3. If the Comptroller General really does require so much time to decide the protest that the stay interferes with important executive interests, CICA authorizes the executive to override the stay. In light of these factors, we simply do not believe that the executive has shown that CICA creates any significant impediment to the President's execution of the law. In fact, we are persuaded that any intrusion permitted by CICA upon the executive branch "can only be termed de minimis." *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 106 S.Ct. 3245, 3260, 92 L.Ed.2d 675 (1986).

809 F.2d at 997 (footnotes omitted).

We conclude that the balance favors Congress's chosen response to the problem it found to exist, that procuring agency officials have long ignored the congressional mandate to use competitive contracting. The Comptroller General's evaluation of bid protests provides an important congressional oversight mechanism to promote this objective, and the stay provisions help insure that procuring agency officials at least will listen and respond to the Comptroller General's recommendations.[7]

## II. THE BID EVALUATION AND CONTRACT AWARD

■ Lear Siegler appeals from the district court's grant of summary judgment to the Navy upholding the award of the contract to IMI. Lear Siegler contends that the award violated the laws and regulations governing contract awards based on sealed bids. Its argument was rejected both by the GAO in considering Lear Siegler's initial bid protest and by the district court.

The district court based its conclusion on its interpretation of Department of Defense (DOD) regulations and the "Buy American Act," 41 U.S.C. §§ 10a–10c. We review its decision *de novo. United States v. McConney,* 728 F.2d 1195, 1202 (9th Cir.1984) (en banc).

The Navy's solicitation for bids from potential suppliers of F/A–18 aircraft fuel tanks indicated that the Buy American Act and DOD implementing regulations governed the contract award. The Buy American Act requires procuring government agencies to purchase American-manufactured goods unless the head of the procuring agency "shall determine it to be inconsistent with the public interest, or the cost to be unreasonable ..." 41 U.S.C. § 10a. DOD implementing regulations under this act require that bids by "nonqualifying"

---

6. Pre–CICA regulations of the GAO provided for a stay of contracts in some circumstances, but the stay was easily overridden by the procuring agency. *Ameron I,* 787 F.2d at 878–79.

7. The Navy expresses concern that upholding CICA's stay provisions would permit "congressional agents [to] be vested with a whole panoply of powers" incident to the investigative and report-and-wait authority of Congress, including authority to stay many executive-type actions, including law enforcement. Opening Brief at 31–32. However, the cases imagined in the Navy's "parade of horribles" are not before the court. Were they to arise, they would be subject to the same, two-tiered scrutiny we employ here.

foreign contractors must be adjusted upward by 50% when they are compared to domestic bids. 48 C.F.R. § 225.105. However, 48 C.F.R. §§ 225.7500, *et seq.*, provide that this penalty adjustment may be waived by the procuring agency head where a "defense cooperation agreement" exists between the United States and the country offering the bid:

> The Buy American Act and the Balance of Payment Program restrictions are waived only for items listed in appropriate annexes to the agreements with the defense cooperation country. However, the absence of an item from the defense equipment list is without prejudice to the authority of the Secretary to determine in any individual case that application of the restrictions to that item would be inconsistent with the public interest.

48 C.F.R. § 225.7502(b).

Israel and the United States had entered into a Memorandum of Agreement in 1979. This agreement contained an "Annex B" which provided a list of items exempt from the restrictions, including a fuel tank of a type similar to that purchased by the Navy from IMI. When, in March 1984, Israel and the United States amended the Agreement, the governments agreed to amend Annex B to list categories rather than specific items. The completion of Annex B was somehow delayed, however, and, in June 1984, Acting Navy Undersecretary Wade issued a memorandum stating that, while completion of Annex B was pending, the Navy would

> consider exemption of the Buy American Act/Balance of Payments Program on a purchase-by-purchase basis, if absent these penalty factors the offer of an Israeli product is the lowest price. My intent is not to exclude competition for Israeli products only because a new Annex "B" has not been published.

The Navy bid solicitation went out in August, and the bids were publicly opened on November 15, 1984. On November 20, 1984 Lear Siegler filed a protest with the Navy arguing that application of the 50% penalty factor to IMI's bid would make Lear Siegler's bid the lowest. On December 31, 1984, the government of Israel requested a waiver of the Buy American Act restrictions, which was granted on January 16, 1985. Assistant Navy Secretary Pyatt issued a "Determination and Findings," stating that the Navy was authorized to waive the restrictions based on Undersecretary Wade's memorandum and that "fuel tanks similar to those being purchased were included in the previous Annex B and there is no reason to expect this type of item will be deleted." He found it "inconsistent with the public interest" to apply the Buy American restrictions. Lear Siegler filed its bid protest with the GAO in February, and in April the Comptroller General found the protest to be without merit.

Lear Siegler, in this appeal, does not challenge the authority of the Navy under the Buy American Act and applicable regulations to waive the Act's restrictions where the public interest is served by doing so. Nor does Lear Siegler argue that the Navy's determination regarding "the public interest" was arbitrary or irrational. Rather, Lear Siegler claims that the Navy violated its bid procedures by "changing the rules" after the opening of the bids.

Relying on *Superior Oil Co. v. Udall*, 409 F.2d 1115 (D.C.Cir.1969), Lear Siegler argues that the terms set forth in the bid solicitation are binding on the procuring agency in awarding the contract, and the agency does not have discretion to waive terms and regulations after opening the bids. In *Superior Oil*, the highest bidder for an oil and gas lease had failed to sign his bid, although he had included a signed transmittal letter in the bid envelope. The Secretary of the Interior determined that the bid was valid by virtue of the "hornbook" contract principle that the two documents together formed a valid contract because the signed transmittal letter incorporated the bid by reference. The court rejected this position, holding that the bid was defective because the bid regulations required that all bids be signed. The integrity of the bidding process demanded "steadfast compliance" with the regulations; thus, "[g]eneral rules of Government contract law must give way to the

specific regulations and Notice of Sale governing this kind of transaction." 409 F.2d at 1121.

According to Lear Siegler, the waiver provision of the Buy American Act and its regulations is a "general rule" that "must give way" to the terms of the bid solicitation providing for the 50% penalty factor. The basis for Lear Siegler's argument is somewhat mystifying. Lear Siegler points out that the Navy's bid solicitation incorporated by reference DOD Federal Acquisition Regulation (DOD FAR) 52.225-7001, 48 C.F.R. § 252.225-7001 (1986). This regulation provides at subsection (c), that "offers will be evaluated in accordance with the policies and procedures of FAR Part 25 and DOD FAR Supplement Part 225." DOD FAR Supplement Part 225, codified at 48 C.F.R. §§ 225, et seq., contains the provision imposing the 50% penalty factor. 48 C.F.R. § 225.105. But it also contains the quoted waiver provision, 48 C.F.R. §§ 225.-7501, 225.7502. Inexplicably, Lear Siegler ignores the fact that the bid solicitation incorporates the waiver language, and argues that these Buy American Act waiver regulations are part of the "general Government contract law" and not the law regulating the bid procedure. This argument, and the suggestion that the Navy "changed the rules" by resorting to the waiver procedure, has no merit.

Lear Siegler further argues that under *Armstrong & Armstrong v. United States,* 514 F.2d 402 (9th Cir.1975), *aff'g* 356 F.Supp. 514 (E.D.Wash.1973), the government cannot adjust or recompute a bid after bid opening. In *Armstrong,* the bidders were required to provide estimates on 82 separate items as well as a total bid representing the sum of the 82 estimates. The second lowest bidder, Bovee & Crail, had made an arithmetic mistake: the 82 item estimates should have added up to $1,413,000 whereas the total given by Bovee & Crail was $1,418,000. The plaintiff, Armstrong & Armstrong bid $1,415,000. The government, sua sponte, corrected the arithmetic and informed Bovee & Crail that it would be deemed the lowest bidder at $1,413,000. According to the Court of Appeals, which adopted the district court's reasoning:

[t]he government could not know from the face of the bid whether the error lay in one of the component items or in the summation. Bovee & Crail stated that the error was in the addition. If, however, it had appeared that Bovee & Crail was already the low bidder Bovee & Crail could have informed the government that the error was not in the addition but in one of the component items, and thus maintain the higher bid. This opportunity to second guess one's bid after the bids have been opened subverts the competitive process ...

The instant case is distinguishable from *Armstrong* in that there is no error or ambiguity on the face of IMI's bid. The only uncertainty stems from the Navy's choice whether or not to exercise its discretion to waive the Buy American Act penalty factor. Moreover, the opportunity for the bidder to "hedge" his bid—that is, to exploit an ambiguity so as to raise his price and yet remain the low bidder—is not present in the instant case.

Lear Siegler argues that IMI could have "decided after bid opening that its bid was too low for comfort" and "avoided a contract by not asking for a 'waiver'" of the Buy American Act. Yet it is hard to see how IMI could have so "subverted" the competitive bidding process. First, there is no reason to assume, as Lear Siegler apparently does, that the waiver provisions of the Buy American Act and supporting regulations must be triggered by a request from the bidder. Although Israel did make such a request in this case, presumably the Navy could have waived the Act on its own initiative and awarded the contract to IMI. Second, Lear Siegler gives no reason why a bidder would advance a bid lower than the amount for which it would be willing to provide services; but even if a bidder were to do that, the placement of a bid represents the acceptance of a contract (the bid solicitation being the offer), and the government would have a damages action against any contract awardee that tried to renege. The rationale of *Armstrong* does not apply here.

Finally, Lear Siegler argues that the integrity of the sealed bidding process is compromised when the procuring agency can apply its discretionary waiver authority *after* bid opening. Lear Siegler's rationale appears to be that the contract award must go automatically to the low bidder, and that IMI only became the low bidder once the Assistant Secretary exercised his discretion to waive the 50% penalty factor. This argument was duly considered and rejected by both the GAO and the district court. As the Navy points out in its brief, the logic of the waiver provision implies that waivers will often, if not always, be made after bid opening. The statute and regulations clearly grant the procuring agency discretion to make the waiver, "in any individual case," based on its determination of the national interest. 48 C.F.R. § 225.7502(b). Such a particularized determination need not be made without knowing whether the foreign bidder has placed the lowest bid, and possibly cannot be made prior to bid opening, when the identity of foreign contractors and the amounts of their bids are unknown. Thus, were we to accept Lear Siegler's position, the waiver provision would be meaningless in the sealed bid context.

■ Contrary to Lear Siegler's argument, the integrity of the bid process is not "compromised" by the use of the waiver after bid opening. Lear Siegler knew, or should have known, that the "rules" permit the waiver, and could have calculated its bid accordingly. The possibility of a waiver *ex ante* cannot be said to add appreciably to the uncertainty of contractors in sealing their bids. Indeed, they may not even know with certainty whether any foreign contractors are placing bids. Perhaps it is in some undefined sense "unfair" to "play favorites" after bid opening, but we cannot say that the determination by Congress in enacting the Buy American Act to give procuring agencies this discretion is unlawful.

### III.  ATTORNEYS' FEES

The Navy appeals the district court's award of attorneys' fees to Lear Siegler for prevailing on the constitutionality of the CICA stay provisions. Attorneys' fee awards are reviewed under an abuse of discretion standard, *Foster v. Tourtellotte,* 704 F.2d 1109, 1110–11 (9th Cir.1983); *see Hensley v. Eckerhart,* 461 U.S. 424, 436–37, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1982), but the legal interpretation of the attorneys' fee statute is reviewed *de novo. LaDuke v. Nelson,* 762 F.2d 1318, 1333 (9th Cir.1985), *modified,* 796 F.2d 309 (9th Cir. 1986).

Subsection (b) of the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(b) empowers the district court to award fees and expenses "to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity," provided that such a fee award is authorized by statute or could have been made against a private party at common law. The district court based the fee award in the instant case on the common law "bad faith" exception to the rule that civil litigants normally bear their own costs.

### A.  Prevailing Party

■ We must first consider whether Lear Siegler, which prevailed on the constitutional issue but lost on the merits of its bid protest, is a "prevailing party" under the EAJA.

■ The term "prevailing party" in the EAJA must be defined consistently with the interpretation of that term in other attorneys' fee statutes. *McQuiston v. Marsh,* 707 F.2d 1082, 1085 (9th Cir.1983); *see Hensley v. Eckerhart,* 461 U.S. at 433 n. 7, 103 S.Ct. at 1939 n. 7 ("The standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'") The Ninth Circuit has consistently held that a litigant "need only have received *some* of the benefits [he] sought in the suit" to be a "prevailing party." *Greater Los Angeles Council on Deafness v. Community Television of Southern California,* 813 F.2d 217, 220 (9th Cir.1987) (emphasis added); *accord McQuiston v.*

*Marsh,* 707 F.2d at 1085 (party who prevails "on *an important matter* in the course of litigation" may be eligible to recover fees); *Fitzharris v. Wolff,* 702 F.2d 836, 838–39 (9th Cir.1983) (same). This formulation follows directly from the Supreme Court's statement in *Hensley v. Eckerhart, supra,* that litigants cross the "prevailing party" threshold for a fee award "if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." 461 U.S. at 433, 103 S.Ct. at 1939. The Navy's suggestion in its brief that a "prevailing party" must succeed on "the *central* issue in the case" is thus incorrect as a statement of the law; to the extent that cases from other circuits cited by the Navy adopt that position, *see e.g., Taylor v. City of Fort Lauderdale,* 810 F.2d 1551, 1555–56 (11th Cir.1987); *Kentucky Assoc. for Retarded Citizens v. Conn,* 718 F.2d 182, 186–87 (6th Cir.1983), those cases deviate from the rule stated in *Hensley,* and are clearly not the law in this circuit. Under *Hensley,* the question of the "centrality" of the issue to the litigation is only relevant in determining the *amount* of the fee award, and does not determine the litigant's eligibility for fees as a prevailing party. *See Hensley,* 461 U.S. at 434–37, 103 S.Ct. at 1940–41.

Applying this standard to the instant case, it is clear that the CICA-constitutionality issue formed an important part of Lear Siegler's litigating objective. In its initial complaint for declaratory and injunctive relief, Lear Siegler sought a court order to compel the Navy to comply with CICA's stay provisions by refraining from going forward with its contract with IMI until the Comptroller General issued his decision. The Navy answered this claim for relief by challenging the constitutionality of the stay provisions. Thus, the constitutional issue goes to the heart of one of Lear Siegler's claims: that the Navy comply procedurally with CICA.

According to the Navy, our holding on constitutionality was not a goal sought by Lear Siegler in this litigation, in that "Plaintiff did not seek to uphold the validity of the stay provisions for their own sake but to augment its chance of reversing the contract award." Opening Brief at 40. But there is no need for this court to scrutinize the "purity" of Lear Siegler's motives in bringing this litigation. The stay provisions were implemented, in part, to aid frustrated bidders like Lear Siegler in pressing their claims to the GAO. The constitutional validity of those provisions, once challenged by the Navy, became a necessary precondition to Lear Siegler's enforcement of its right to be heard under CICA.[8]

Litigants who succeed on a claim to compel a defendant to comply procedurally with the law can be "prevailing parties" even if they do not win relief on their related substantive claim. *See Greater L.A. Council,* 813 F.2d at 220–21 (plaintiff "prevailed" for attorneys' fee purposes by establishing defendant's duty to comply with applicable statute). The Navy argues that, nevertheless, Lear Siegler is not the "prevailing party" because Lear Siegler will have achieved no "practical" or "tangible" benefit from a decision upholding the constitutionality of CICA's stay provisions, given that we have rejected Lear Siegler's claims on the merits of its bid protest. We disagree with the Navy's suggestion that Lear Siegler derives no benefit from a holding whose effect is to compel the government to comply with CICA. Although its bid protest failed in this particular case, Lear Siegler has a long-term interest in CICA compliance because it is likely to bid on government contracts in the future. To the extent that the Navy's phrases "tangible benefit" or "practical benefit" are euphemisms for pecuniary benefit, their argument lacks merit, for we have never held pecuniary gain to be the litmus test for a "prevailing party." Nor is the Navy per-

---

**8.** The Navy's notion of litigating the validity of the stay provisions "for their own sake" is rather vague; if the Navy means that commercial objectives are somehow an illegitimate basis for arguing a constitutional claim, then it is hard to imagine how a private litigant would ever have standing to litigate the constitutional validity of CICA. Obviously, a pecuniary motive does not undercut a litigant's standing to bring constitutional claims.

suasive in the suggestion that Lear Siegler could be harmed by CICA compliance in the future, if Lear Siegler wins a contract award and the bid protest is lodged by someone else. If such cost-benefit calculations are relevant to determining "prevailing party" status—which seems doubtful—we can simply assume that Lear Siegler took them into account in deciding to bring the instant litigation. We can also take for granted that a party benefits when the government impartially obeys a law that is intended for the benefit of that party in *at least some instances.*

Finally, the Navy argues that Lear Siegler should not be considered a "prevailing party" because it relied to a great extent on the briefing of the intervenors on the constitutionality issue. While this may be true, Lear Siegler's reliance on the work of other parties does not diminish the importance of the CICA issue to Lear Siegler as a threshold matter. The amount of work put in by Lear Siegler's attorneys on the constitutional issue should be considered only in determining the amount of the fee award.

### B. Bad Faith

Section 2412(b) of the EAJA makes the United States liable to the prevailing party for fees "to the same extent that any other party would be liable under the common law ..." 28 U.S.C. § 2412(b). Having determined that Lear Siegler is a "prevailing party," it remains to be seen whether the government defendants are liable for fees under a common law exception to the "American rule" that litigants bear their own expenses. *See Barry v. Bowen,* 825 F.2d 1324, 1334 (9th Cir.1987).

#### 1. Legal Standard for Bad Faith

▮▮▮▮ Attorneys' fees may be assessed against a losing party which has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons...." *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975) (quoting *F.D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40

L.Ed.2d 703 (1974)). The "bad faith" exception predates the EAJA, which makes that exception applicable in suits against the United States. H.R.Rep. No. 1418, 96th Cong., 2d Sess. 8–9, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4953, 4984, 4987. In analyzing the bad faith exception under the EAJA, we may therefore look to cases applying the exception outside the EAJA context. *Barry v. Bowen,* 825 F.2d at 1334; *see Spencer v. NLRB,* 712 F.2d 539, 546 (D.C.Cir.1983). An award of attorney fees under the "bad faith" exception is punitive, and the penalty can be imposed "only in exceptional cases and for dominating reasons of justice." *Beaudry Motor Co. v. Abko Properties, Inc.,* 780 F.2d 751, 756 (9th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 100, 93 L.Ed.2d 51 (1986) (quoting *United States v. Standard Oil Co.,* 603 F.2d 100, 103 (9th Cir.1979)). The burden is on the plaintiff to show the government's bad faith. *United States v. Ford,* 737 F.2d 1506, 1509–10 (9th Cir.1984). An award based on bad faith must be supported by specific findings that are not clearly erroneous or on sufficient evidence appearing in the record. *See Toombs v. Leone,* 777 F.2d 465, 471 (9th Cir.1985); *Dogherra v. Safeway Stores,* 679 F.2d 1293, 1298 (1982). If bad faith is found, a fee award is within the district court's discretion. *Dogherra,* 679 F.2d at 1298.

The Navy argues strenuously that bad faith can be established only when the district court finds both that the losing party's claims were entirely "frivolous, unreasonable or groundless," and at the same time "made for reasons of harassment or delay or for other improper purposes." Opening Brief at 44–45. This argument may well be correct where the alleged bad faith arises from the losing parties' conduct of the litigation and the merit of its claims or litigation position. We do not take issue with the Navy's assertion that its constitutional claims in the district court and here, even though they do not prevail, are not "unreasonable" or "groundless." But the entire argument is beside the point, because a finding of bad faith here is based on the government's conduct *giving rise to* the legal controversy: specifically, its inten-

tional refusal to abide by the stay provisions of CICA.

This court has consistently held that bad faith supporting an award of attorneys fees may be found in conduct that led to the lawsuit as well as conduct occurring in the course of the litigation. *International Union of Petroleum & Industrial Workers v. Western Industrial Maintenance,* 707 F.2d 425, 428 (9th Cir.1983) (citing *Hall v. Cole,* 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973); *accord McQuiston v. Marsh,* 707 F.2d at 1086; *Dogherra v. Safeway Stores,* 679 F.2d at 1298.[9] Prelitigation conduct has been held to constitute bad faith when a party, confronted with a clear legal duty, is so recalcitrant in performing that duty that the injured party is forced to resort to litigation to vindicate his rights. *IUPIW,* 707 F.2d at 428–29.

This principle arises from *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), in which a seaman, who had been hospitalized for tuberculosis and unable to work, sought "maintenance and cure" from the shipowner. Although the shipowner was clearly responsible to pay a valid claim for maintenance and cure, the shipowner made only a cursory investigation of the claim and took no action for two years, after which the seaman brought suit. The Court upheld an award of attorneys' fees to the seaman because, "[a]s a result of [the shipowner's] recalcitrance, [the seaman] was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old." *Id.* at 531, 82 S.Ct. at 999. Although *Vaughan* sounded in admiralty, the Supreme Court subsequently construed the case as an example of bad faith conduct justifying an award of attorneys' fees in civil litigation generally. *See F.D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. at 116, 129 & n. 17, 94 S.Ct. at 2157, 2165 & n. 17; *Alyeska Pipeline,* 421 U.S. at 258–59, 95 S.Ct. at 1622; *see also Skehan v. Board of Trustees,* 538 F.2d 53, 57–58 (3rd Cir. 1976) (en banc) (observing that *Vaughan* applies to non-admiralty cases and its fee-shifting principle survives *Alyeska Pipeline* ).

■■■ The next inquiry, then, is what specifically constitutes "bad faith" on the part of the government. The precedents offer limited guidance here, because the government's action in declaring unconstitutional and purposely disregarding sections of a presumptively valid law is, itself, unprecedented. Clearly, the case law tells us that the bad faith standard under § 2412(b) "must be higher than the substantial justification standard" of § 2412(d). *Barry v. Bowen,* 825 F.2d at 1334.[10] In *Barry,* the government's implementation and defense of a review program that pressured selected administrative law judges to reduce their percentage of benefit allowances to claimants, while "patently unreasonable," *id.* at 1331, did not amount to bad faith. *Id.* at 1334. *See also Massachusetts Fair Share v. LEAA,* 776 F.2d 1066, 1069 & n. 21 (D.C.Cir.1985) (agency's defense of its unilateral revocation of grant was "not at all justified," but not in bad faith). The standard for determining whether the government's position is substantially justified is one of "reasonableness." *Foster v. Tourtellotte,* 704 F.2d 1109, 1112 (9th Cir. 1983) (quoting H.R.Rep. No. 1418, 96th Cong., 2d Sess. 10–11, *reprinted in* 1980 U.S.Code Cong. & Admin.News 4953, 4984, 4989–90). Thus, government conduct constituting bad faith must be more than unreasonable. *See Barry,* 825 F.2d at 1334.

---

9. We recognize that this court's interpretation of *Hall v. Cole* was disapproved by the Sixth Circuit in *Shimman v. International Union of Operating Engineers,* 744 F.2d 1226, 1233 n. 10 (6th Cir.1984) (en banc). We are not persuaded by that court's reasoning that "bad faith" can only occur during litigation. In any event, we are bound by the law of our own circuit.

10. 28 U.S.C. § 2412(d)(1)(A) provides:
Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

The federal government and state governments have been found culpable of bad faith conduct where they have acted (or failed to act) in disregard of clearly established statutory or constitutional mandates. *See Fitzgerald v. Hampton,* 545 F.Supp. 53, 58–60 (D.D.C.1982) (Air Force's compliance plan for reinstating wrongfully terminated employee, which had little hope of withstanding judicial scrutiny, constituted bad faith); *Burnaman v. Bay City Independent School Dist.,* 445 F.Supp. 927, 939 (S.D.Tex.1978) (wrongfully terminated teacher forced by defendant's obstinacy to bring action to enforce constitutional rights, entitled to attorneys' fees for bad faith); *Sims v. Amos,* 340 F.Supp. 691, 693–94 (M.D.Ala.1972) (three-judge court, per curiam), *summarily aff'd,* 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972) (where constitutional duty of reapportionment was clear, Legislature's failure to act, necessitating litigation, showed bad faith); *see also Fairley v. Patterson,* 493 F.2d 598, 606 (5th Cir.1974) (defense of suit for violation of clearly-established voting rights law justified attorneys fee award). However, the government does not act in bad faith where it seeks "judicial resolution of an important, doubtful question of law not subject to resolution by clear, controlling precedent," *Minor v. United States,* 797 F.2d 738, 739 (9th Cir.1986), or where the government has advanced "a novel but credible extension or interpretation of the law." *Foster v. Tourtellotte,* 704 F.2d at 1112.

### 2. The Government's Conduct in this Case

A brief recitation of the facts surrounding the entire CICA controversy reveals the truly unprecedented nature of the government's actions underlying this case.[11] On July 18, 1984, President Reagan signed CICA into law as part of the Deficit Reduction Act of 1984, making this statement:

I am today signing H.R. 4170. In signing this important legislation, I must vigorously object to certain provisions that would unconstitutionally attempt to delegate to the Comptroller General of the United States, an officer of Congress, the power to perform duties and responsibilities that in our constitutional system may be performed only by officials of the executive branch. This administration's position on the unconstitutionality of these provisions was clearly articulated to Congress by the Department of Justice on April 20, 1984. I am instructing the Attorney General to inform all executive branch agencies as soon as possible with respect to how they may comply with the provisions of this bill in a manner consistent with the constitution.

The Justice Department then prepared an internal memorandum for the Attorney General, which was distributed widely among executive agencies, particularly those charged with major procurement responsibilities, such as the Department of Defense. This memorandum commented on CICA as follows:

In summary, we believe that the stay provisions ... are unconstitutional and should be severed in their entirety from the remainder of the Act. In addition, the damages provision ... is similarly unconstitutional and should be severed from the rest of the CICA. Because these provisions are unconstitutional, they can neither bind the Executive Branch nor provide authority for Executive Branch actions. Thus, the Executive Branch should take no action, including the issuance of regulations, based upon these invalid provisions.

We recommend that Executive Branch agencies implement these legal conclusions in the following manner. First, with respect to the stay provisions, all executive agencies should proceed with the procurement process as though no stay provision were contained in the CICA....

---

11. This factual summary is drawn from *House Report, supra,* H.R.Rep. No. 138, 99th Cong., 1st Sess. 5–8 (1985). The relevant documents are reprinted in the appendices of *Constitutionality of GAO's Bid Protest Function: Hearings Before a Subcomm. of the House Comm. on Government Operations,* 99th Cong., 1st Sess. (1985).

On November 21, 1984, Attorney General William French Smith officially notified Congress that he found these provisions to be unconstitutional and that the executive branch would not implement them. On December 17, 1984, OMB Director David Stockman, pursuant to his powers to direct procurement under the Office of Federal Procurement Policy Act, issued OMB Bulletin No. 85–8, which stated:

> Agencies shall take no action, including the issuance of regulations, based upon the invalid provisions.

> With respect to the "stay" provision, agencies shall proceed with the procurement process as though no such provision were contained in the Act.

Both the instant case and *Ameron v. U.S. Army Corps of Engineers* were brought in part to challenge government actions taken pursuant to the OMB order. Meanwhile, the Legislation and National Security Subcommittee of the House Committee on Government Operations held hearings on February 28 and March 7, 1985, on the "Constitutionality of GAO's Bid Protest Function." *Hearings, supra* note 11. Testifying on behalf of the administration, Acting Deputy Attorney General D. Lowell Jensen stated that

> in case of a conflict between the Constitution and a statute, the President's duty faithfully to execute the law requires him not to observe a statute that is in conflict with the Constitution, the fundamental law of the land.

*Hearings*, at 318. In a subsequent hearing before the House Judiciary Committee on April 18, 1985, Attorney General Edwin Meese expanded on this position by stating that the President has the duty to put his own interpretation of the Constitution ahead of any statute and obey it rather than the statute itself, and that, furthermore, the executive branch might not honor the CICA stay provisions until those were upheld by the Supreme Court. *House Report, supra,* at 8; *Ameron I,* 787 F.2d at 899–90. This position was roundly condemned by Congress, which threatened to cut appropriations for agency procurement and for the salaries of top Justice Department officials if the executive branch should refuse to comply with CICA and the Third Circuit's decision in *Ameron. House Report, supra,* at 39–40; N.Y. Times, May 9, 1985, at A 28, col. 1. The House Committee on Government Operations issued its report on May 21, 1985, condemning the President's "suspension" of CICA as unconstitutional. *House Report, supra.*

The facts relied upon by the district court to support its finding of bad faith are not in dispute. The government awarded the contract to IMI "without any compliance at all with [CICA, 41 U.S.C.] § 3553(c)," thereby "refusing to obey a presumptively valid act of Congress." Indeed, the government had promulgated regulations after the president signed CICA into law, specifically providing that the stay provisions were not binding. 50 Fed.Reg. 2270, 2271 (Jan. 15, 1985).[12] The govern-

---

**12.** CICA, 31 U.S.C. § 3553(c)(2) provides that a pre-award stay can be overridden by a written finding from the *head* of the procuring agency that "urgent and compelling circumstances" preclude compliance with the stay. However, the original version of the "implementing" regulation, 48 C.F.R. § 33.104, provided that the stay could be overridden upon a finding by "the contracting officer or other designated official" that:

(i) The supplies or services to be contracted for are urgently required;

(ii) Delivery or performance will be unduly delayed by failure to make award promptly; *or*

(iii) A prompt award will otherwise be advantageous to the Government.

50 Fed.Reg. at 2271 (emphasis added). In addition, the original regulation stated that post-

award stays could be disregarded "unless it appears likely that an award may be invalidated and a delay in receiving the supplies or services is not prejudicial to the Government's interest." *Id.* In contrast, § 3553(d)(2), requires a finding that "urgent and compelling circumstances" exist or that contract performance "is in the best interests of the United States." We agree with the district court that the original regulations reflected a lack of "any compliance at all" with the challenged stay provisions.

The government subsequently revised the regulations to their present form, when, "[o]n June 5, 1985, as a result of a decision in *Ameron, Inc. v. U.S. Army Corps of Engineers,* 607 F.Supp. 962, 1985, (D.C.N.J.), which held the cited provisions to be constitutional, the Department of Justice advised Federal agencies to comply with those provisions pending further appeal." 50

ment's "clearly willful" failure to comply with § 3553(c) forced plaintiff to bear the expense of litigation to compel the government to follow the law. The district court also found the government to have indulged in "judicial gamesmanship" to force the constitutional issue before the court. The government produced a declaration by Admiral Busby, to the effect that a delay in the performance of the IMI contract would jeopardize the nation's defense. The substance of this declaration could have been submitted under § 3553(c)(2)(A) to override a stay and thereby avoid a constitutional challenge in this case. Each of these findings is amply supported in the record, and it cannot be said that they are clearly erroneous.

It is important to emphasize that the district court did not assess attorneys' fees against the government for its argument that CICA is unconstitutional; that issue, prior to today, presented an important question of law arguably "not subject to resolution by clear, controlling precedent," at least in this circuit.[13] The government's arguments on the merits were "credible" and "colorable." Instead, the question facing this court is whether the district court abused its discretion in basing a bad faith attorneys' fee award on the executive branch's willful and deliberate refusal to comply with a presumptively valid law. This issue has separation-of-powers ramifications no less momentous than those stemming from the CICA issues.

### 3. Analysis of the Bad Faith Issue

Based on the precedents which equate bad faith with the government's willful re-

fusal to comply with a statutory or constitutional duty, we must conclude that the government has acted in bad faith in its conduct giving rise to this case, and that an award of attorneys' fees is appropriate, unless there is some justification for the government's conduct. Here, the government reasserts the position taken by the Justice Department before Congress: that the President's suspension of the CICA stay provisions is justified, because the President's duty to uphold the constitution and faithfully execute the laws empowers the President to *interpret* the Constitution and *disregard* laws he deems unconstitutional. Because we regard this position as utterly at odds with the texture and plain language of the Constitution, and with nearly two centuries of judicial precedent, we must reject the government's contention and affirm the district court's award of attorneys' fees.

The President, upon assuming office, swears that he "will faithfully execute the Office of President" and will "preserve, protect and defend the Constitution of the United States." Art. II, § 1, cl. 8. The President is further charged with the duty to "take care that the laws be faithfully executed." Art. II, § 3. According to the government, these clauses empower the President to take the action he did in this case: essentially, to declare a law unconstitutional and suspend its operation. Not surprisingly, the government offers scant and extremely questionable support for this dubious assertion of power. *See* Opening Brief at 46.[14]

Fed.Reg. at 25680 (June 10, 1985). *See* 48 C.F.R. § 33.104 (1986).

**13.** However, the administration's threat to disregard the precedential effect of lower court decisions on CICA, *see Ameron I,* 787 F.2d at 889–90, raises questions about its respect for the lower courts in general.

**14.** The Justice Department's presentation to the House of Representatives was similarly devoid of legal authority. *See House Report,* at 2; *Hearings,* at 432–39 (Letter dated Feb. 22, 1985, from Attorney General William French Smith to the Hon. Peter W. Rodino, Jr., Chairman, House Judiciary Comm.)

The Attorney General's letter, responding to a specific request by the House Judiciary Committee to provide authority for the administration's actions, attempted to derive the asserted power to suspend CICA from the apparently-established authority of the executive branch to decline to defend statutes under legal challenge. The Attorney General asserted that "decisions not to execute and not to defend a statute are inextricably intertwined." However, *INS v. Chadha,* relied upon in the Attorney General's letter, is inapposite because the executive branch in that case complied with the challenged legislative veto provision until it was struck down by the Court of Appeals. *See* 462 U.S. at 939–40, 103 S.Ct. at 2778.

The government relies on language in *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), for the proposition that the President's oath carries with it an independent responsibility to assess the constitutionality of legislation. This reliance is misplaced. According to the Court:

> In the performance of *assigned constitutional duties*, each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others.

418 U.S. at 703, 94 S.Ct. at 3105 (emphasis added). While the executive branch clearly must conform its actions to constitutional principles, it sometimes falls upon the President to determine that some inherent power, necessary to carrying out an assigned constitutional duty, exists within that "zone of twilight in which he and Congress may have concurrent authority or in which its distribution is uncertain." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. at 637, 72 S.Ct. at 871 (Jackson, J., concurring). Nevertheless, it is obvious that the language quoted from *Nixon* does not expand the President's assigned role in the legislative process, nor does it permit the executive branch to interpret the Constitution so as to assume additional powers or thwart the constitutional functions of a coordinate branch. The Court in *United States v. Nixon* rejected the President's claim of an "absolute executive privilege" inhering in the presidency, where it came into conflict with "the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions." 418 U.S. at 707, 94 S.Ct. at 3107. Notably, the *Nixon* language referring to the three branches' interpretive duties was followed by a reaffirmation of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), and the federal courts' traditional role in interpreting the Constitution pursuant to its function of judicial review. 418 U.S. at 703–04, 94 S.Ct. at 3105. The Court also affirmed that:

> "Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution."

418 U.S. at 704, 94 S.Ct. at 3105–06 (quoting *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962)). Thus,

---

The primary authorities offered by the Attorney General are instances of presidential disobedience to statutes requiring consent by the Senate to removal of government officers. *Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), involved a suit for back pay on behalf of a postmaster of Portland, Oregon, who had been fired by President Wilson in violation of the Tenure of Office Act of 1867. Although the Court vindicated the position taken by several presidents since Andrew Johnson that the Act unconstitutionally infringed on the President's removal power over "purely executive" officers, the Court did not pass upon the constitutional propriety of the President's action in disobeying the law. In *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), also cited by the Attorney General, a unanimous Court sustained the provision of the Federal Trade Commission Act breached by President Roosevelt in firing a Federal Trade Commissioner. Again, the Court did not address the constitutionality of the President's violation of the law. Thus, neither *Myers* nor *Humphrey's Executor* can be said to establish the proposition that the executive branch may willfully violate laws it deems unconstitutional.

Nor does President Johnson's removal of the Secretary of War, flouting the Tenure of Office Act which had just been passed over his veto, provide any support for the administration's position. *See House Report*, at 19–20. No judicial decision emerged out of that controversy. The firing did, however, result in President Johnson's impeachment, illustrating that the executive branch violates the law at its constitutional peril. *See also House Report*, at 40 (threatening to cut appropriations in response to continued failure to comply with CICA).

In sum, prior historical examples of the executive branch disobeying the law prove no more than that the executive branch has occasionally been lawless in the past. There are many reasons why the Supreme Court in *Myers* and *Humphrey's Executor* could have refrained from addressing the propriety of the executive violation of the law without intending to express tacit constitutional approval. "That an unconstitutional action has been taken before surely does not render that same action any less unconstitutional at a later date." *Powell v. McCormack*, 395 U.S. 486, 546–47, 89 S.Ct. 1944, 1977, 23 L.Ed.2d 491 (1969).

*United States v. Nixon* lends support only to the view that the executive branch in this case exceeded its authority.

Nor do *Chadha* and *Bowsher,* also cited by the government, support the contention that the executive branch may declare laws unconstitutional and suspend their operation. Whatever might be said of the executive branch's authority to join in court challenges to the constitutionality of federal statutes, the Supreme Court's tacit acceptance of this practice in *Chadha* and *Bowsher* cannot be construed to condone the executive branch's conduct here: affirmatively disregarding a statute in order to create a justiciable controversy to bring a constitutional challenge into court.[15]

Indeed, *Chadha* and *Bowsher* provide authority against the government's assertion. While considering the constitutionality of a "legislative veto" provision in light of Congress's constitutionally-assigned legislative function, the Court in *Chadha* had occasion to summarize the Constitution's legislative process as a whole:

> Explicit and unambiguous provisions of the Constitution prescribe and define the respective functions of the Congress *and of the Executive in the legislative process.*

462 U.S. at 919, 103 S.Ct. at 2764 (emphasis added); *see also Bowsher,* 106 S.Ct. at 3189. The Court in *Chadha* continued:

> We see therefore that the Framers were acutely conscious that the bicameral requirement and the Presentment Clauses would serve essential constitutional functions. The President's participation in the legislative process was to protect the Executive Branch from Congress and to protect the whole people from improvident laws. The division of the Congress into two distinctive bodies assures that the legislative power would

be exercised only after opportunity for full study and debate in separate settings. *The President's unilateral veto power, in turn, was limited by the power of two-thirds of both Houses of Congress to overrule a veto thereby precluding final arbitrary action of one person.... It emerges clearly that the prescription for legislative action in Art. I, §§ 1, 7, represents the Framers' decision that the legislative power of the Federal Government be exercised in accord with a single, finely wrought and exhaustively considered, procedure.*

*Chadha,* 462 U.S. at 951, 103 S.Ct. at 2784 (emphasis added, citation omitted).

The Court's reference to the President's veto power conclusively demonstrates that *Chadha*'s strict adherence to the "single, finely wrought and exhaustively considered, procedure" for enacting legislation applies not only to the role of Congress, but also to the role of the President. Art. I, § 7, cl. 2 provides that, after presentment of a bill to the President, his role is explicitly assigned and strictly limited:

> If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law.... If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the

---

**15.** Neither *Chadha* nor *Bowsher* address the constitutionality of the executive branch's purported authority to litigate constitutional challenges to federal statutes. In both cases, the Court dealt only with the standing of one of the private parties to bring the suit. However, the practice has come under criticism by some scholars. *See, e.g.,* Miller, *The President and the Faithful Execution of the Laws,* 40 Vand.L.Rev. 389, 398 (1987) ("It appears, therefore, that the

present court perceives no constitutional problem with the executive branch's power to contest the validity of federal statutes, although I consider this to be a profoundly erroneous judicial position."). A more established practice of the executive branch is to decline to defend a challenged statute in court, although this, too, raises a constitutional issue. *See generally* Note, *Executive Discretion and the Congressional Defense of Statutes,* 92 Yale L.J. 970 (1983).

Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

This provision is restated in Art. I, § 7, cl. 3, and both are "integral parts of the constitutional design for the separation of powers." *Chadha*, 462 U.S. at 946, 103 S.Ct. at 2781. Moreover, the language of these provisions must guide our resolution of this issue. *Id.*

■■■ Art. I, § 7 is explicit that the President must either sign or veto a bill presented to him. Once signed by the President, as CICA was on July 18, 1984, the bill becomes part of the law of the land and the President must "take care that [it] be faithfully executed." Art. I, § 7 does not empower the President to revise a bill, either before or after signing. It does not empower the President to employ a so-called "line item veto" and excise or sever provisions of a bill with which he disagrees. The only constitutionally prescribed means for the President to effectuate his objections to a bill is to veto it and to state those objections upon returning the bill to Congress. The "line item veto" does not exist in the federal Constitution, and the executive branch cannot bring a de facto "line item veto" into existence by promulgating orders to suspend parts of statutes which the President has signed into law.

Indeed, the executive branch's action in this case assumes a power far more extensive than would be conferred by a "line item veto." Presumably, any extension of the veto power of the President would stop short of doing away with the power of Congress to override the veto. Certainly the framers were strongly opposed to the idea of an absolute veto power for the President, as all but two of the delegates to the constitutional convention who spoke on the subject condemned such a power. *See* 1 M. Farrand, *The Records of the Federal Convention of 1787*, at 98–100 (rev. ed.

1966); *see also Declaration of Independence*, July 4, 1776 (condemning King for having "refused his assent to laws, the most wholesome and necessary for the public good"). The unilateral suspension of the CICA stay provisions in this case afforded no opportunity for a congressional override, thereby violating the override as well as the veto provision of the Constitution. *See Hearings*, at 40 (Written Statement of Professor Sanford Levinson). Such an incursion into Congress's essential legislative role cannot be tolerated.

Nothing in Article II supports the expansion of the President's legislative role urged upon us by the government. Art. II, § 3 provides only that the President may forward information and recommend legislation to Congress. But "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. at 587, 72 S.Ct. at 867. To construe this duty to faithfully execute the laws as implying the power to forbid their execution perverts the clear language of the "take care" clause: "To 'execute' a statute ... emphatically does not mean to kill it." Miller, *The President and the Faithful Execution of the Laws*, 40 Vand.L.Rev. 389, 398 (1987).[16] The government's contention was addressed and rejected by the Supreme Court 150 years ago, in *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838). There, the Court affirmed the issuance of a writ of mandamus ordering the Postmaster General, then a cabinet official, to settle certain claims with mail contractors as required of him by an act of Congress. The Attorney General's lawyer defended the Postmaster General's nonfeasance by relying on the President's full and exclusive duty to execute the laws, 37 U.S. (12 Pet.) at 545–47, 612, but the Court disagreed:

---

**16.** As then Assistant Attorney General William H. Rehnquist said in 1969:

> It is in our view extremely difficult to formulate constitutional theory to justify a refusal by the President to comply with a Congressional directive to spend. It may be argued that the spending of money is inherently an executive function, but the execution of any law, is by definition, an executive function and it seems an anomalous proposition that because the Executive Branch is bound to execute the laws, it is free to decline to execute them.

Quoted in Miller, *supra*, 40 Vand.L.Rev. at 397.

"To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the Constitution and entirely inadmissible." 37 U.S. (12 Pet.) at 613. *See also United States v. Smith,* 27 F.Cas. 1192, 1230 (Cir. Ct.D.N.Y.1806) ("The president of the United States cannot control the statute, nor dispense with its execution"); *Da Costa v. Nixon,* 55 F.R.D. 145, 146 (E.D.N.Y.1972) (Once bill was passed by Congress and signed by the President, "[n]o executive statement denying efficacy to the legislation could have either validity or effect"); *Catano v. Local Board,* 298 F.Supp. 1183, 1188 (E.D.Pa.1969) ("The Presient is not at liberty to repeal Congressional enactments.").

We also note that in declaring the CICA stay provisions unconstitutional and suspending their operation, the executive branch has assumed a role reserved for the judicial branch. It hardly need be repeated that "it is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) at 177. *See United States v. Nixon,* 418 U.S. at 703, 94 S.Ct. at 3105 ("Many decisions of this Court, however, have unequivocally reaffirmed the holding of *Marbury v. Madison* ..."). Passing on the constitutionality of statutory provisions and, at times, severing constitutionally infirm provisions from the operable remainder of a validly enacted law, is a function that is inherently judicial. The executive branch's attempt to arrogate to itself the power of judicial review is a paradigmatic violation of our system of separation of powers and checks and balances. *See, e.g., Nixon v. Administrator of GSA,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977); *Buckley v. Valeo,* 424 U.S. 1, 120, 96 S.Ct. 612, 682, 46 L.Ed.2d 659 (1976). As this court has stated, "If the essential, constitutional role of the judiciary is to be maintained, there must be both the appearance and the reality of control by Article III judges over the interpretation, declaration and application of feder-

al law." *Pacemaker Diagnostic Clinic of America v. Instromedix,* 725 F.2d 537, 544 (9th Cir.1984) (en banc).

In sum, the well-established constitutional principles outlined above make clear that the executive branch exceeded its constitutional authority in suspending the operation of CICA's stay provisions. Accordingly, we cannot say that the district court abused its discretion in finding that the government in this case acted in bad faith. The government intentionally ignored a presumptively valid law; and by ignoring its constitutional functions and duties established "under laws that are centuries old," the government forced a private party to bring suit to enforce its rights under the statute. *Cf. Vaughn v. Atkinson, supra.* Under these circumstances, the award of attorneys fees by the district court is appropriate.

Our conclusion is not called into question by the government's argument that its actions were necessary and the result of a "reasoned determination" to bring the constitutional issue before the court. If anything, the government's explanation of its motive in ignoring CICA and violating the constitutional limits of its power *reinforces* our conclusion. Apparently, the government wishes us to adopt the proposition that the executive branch may flout the constitutional limitations on its powers and declare a statute unconstitutional, so long as its intent in doing so is to injure a party with standing to bring suit; in this way, a justiciable controversy will arise and afford the executive branch the opportunity to bring its constitutional argument before the court. But constitutional limitations upon the executive branch's powers are not mere tools to advance the executive's litigating objectives. To the extent that the government's unconstitutional manipulations underlying this controversy have intruded upon the judiciary's essential role, its actions are the constitutional equivalent of an abuse of the judicial process, which we have elsewhere identified as a

"hallmark of bad faith." *See Barry v. Bowen*, 825 F.2d at 1334; *In re Beverly Hills Bancorp.*, 752 F.2d 1334, 1340 (9th Cir.1984).[17]

## CONCLUSION

We find that the challenged stay provisions of CICA are constitutional; that Lear Siegler's bid protest is without merit; and that the government's intentional refusal to comply with CICA constitutes bad faith, justifying an award of attorneys' fees against it.

We AFFIRM the judgment of the district court in all respects.

17. The government assumes that the executive branch must have some mechanism for testing the constitutionality of statutes without exposing itself to penalties. Apparently accepting this view, the district court and certain of the parties raise the possibility, questioned by the government, that the executive's remedy is to seek declaratory relief. The government argues that such attempts may fail for lack of justiciability or standing.

This court need not consider whether such declaratory actions are available, because there is no reason to accept the underlying assumption that the executive branch must always have a penalty-free means of challenging laws in court. Where private parties violate laws in order to test their constitutionality, in acts of civil disobedience, the party "testing" the law puts his or her liberty at risk in order to raise the constitutional issue. If the litigant loses the constitutional issue, even on a close decision, he or she is left to face the penalty of fines or imprisonment. *Compare Cox v. Louisiana*, 379 U.S. 536, 558, 85 S.Ct. 453, 466, 13 L.Ed.2d 487 (1965) and *Edwards v. South Carolina*, 372 U.S. 229, 238, 83 S.Ct. 680, 685, 9 L.Ed.2d 697 (1963) (convictions overturned on first amendment grounds), *with United States v. O'Brien*, 391 U.S. 367, 369 n. 2, 372, 88 S.Ct. 1673, 1675 n. 2, 1676, 20 L.Ed.2d 672 (1968) and *Adderley v. Florida*, 385 U.S. 39, 47–48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966) (first amendment defenses rejected and convictions affirmed). The same principle applies to "recalcitrant witnesses" who refuse to comply with grand jury subpoenas and appeal their contempt citations on legal or constitutional grounds. *See, e.g., In re Sealed Case*, 829 F.2d 50, 53, 62 (D.C.Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 753, 98 L.Ed.2d 765 (1988) (rejecting Colonel North's constitutional challenge to subpoena and affirming contempt order); *see also United States v. Ryan*, 402 U.S. 530, 532, 91 S.Ct. 1580, 1581, 29 L.Ed.2d 85 (1971) (holding that legal challenges to subpoena become ripe for appellate review only after contempt proceedings brought for refusal to comply). The principle of such cases is that one violates the law at one's peril; the desire to raise even a good faith constitutional challenge confers no privilege to violate the law.

Obviously, we do not mean to suggest that civil disobedients who bring constitutional test cases should ever be liable for attorneys' fees to the government. Our holding is that where the government has acted in bad faith its liability for attorneys' fees under the EAJA is not immunized by virtue of any "privilege" to raise colorable legal challenges.