**UNITED STATES of America, Plaintiff,**

v.

**Larry Roger SPARKS, Carlena Lawrence, Reginald Lawrence, Anthony Blocker, Eartha Diane Gaines, Bonnie Sparks, Elmer Charles Johnson, Eric Sparks, Diane Blacksher, Joseph Lawrence, Julian Lawrence, Bernard Peoples, Brenda Lawrence, Catrena Lawrence, Alex Taylor, Michael Lawrence, and Steve Lawrence, Defendants.**

No. 88–CR–20019–BC.

United States District Court, E.D. Michigan, N.D.

June 7, 1988.

---

**87.** Magistrate's Report at 5.

Michael J. Hluchaniuk, Asst. U.S. Atty., Bay City, Mich., for plaintiff.

Robert E. Bourne, Midland, Mich., for Carlena Lawrence.

Jerome E. Burns, Saginaw, Mich., for Reginald Lawrence.

Stevens J. Jacobs, Brady & Jacobs, P.C., Bay City, Mich., for Eartha D. Gaines.

Henry J. Sefcovic, Bay City, Mich., for Elmer C. Johnson.

Joseph Sheeran, Bay City, Mich., for Diane Blacksher.

David G. Myers, Caro, Mich., for Bernard Peoples.

Harry Gill, Bay City, Mich., for Catrena Lawrence.

Thomas Plachta, Mount Pleasant, Mich., for Michael Lawrence.

Robert J. Rhead, Midland, Mich., for Julian Lawrence.

Robert J. Dunn, Bay City, Mich., for Anthony Blocker.

Philip Sturtz, Saginaw, Mich., for Bonnie Sparks.

Benjamin L. Crossley, Saginaw, Mich., for Eric Sparks.

George C. Bush, Saginaw, Mich., for Joseph Lawrence.

Mark A. Kolka, Bay City, Mich., for Brenda Lawrence.

Richard King, Flint, Mich., for Alex Taylor.

Richard L. Lee, Jr., Midland, Mich., for Steve Lawrence.

## MEMORANDUM OPINION

CHURCHILL, District Judge.

In this criminal case, three of the 17 defendants[1] charged with violations of 18 U.S.C. § 1029 raise constitutional and statutory challenges to the sentencing guidelines promulgated by the United States Sentencing Commission ("Commission") pursuant to the Sentencing Reform Act of 1984 ("Sentencing Reform Act"), Title II of the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, 98 Stat. 1976, 2017 (codified at 28 U.S.C. §§ 991–998). Finding no merit in the defendants' statutory arguments and resolving the constitutional challenges in a manner that permits the sentencing guidelines to remain in force, the Court must deny the defendants' motions to preclude application of the sentencing guidelines.

## I. FACTUAL BACKGROUND AND ARTICLE III CONSIDERATIONS

All of the defendants who have filed motions attacking the guidelines are subject to a plea cut-off date of June 21, 1988. Faced with a degree of uncertainty concerning the applicability of the sentencing guidelines, the defendants wish to know whether they will be sentenced under the guidelines before they enter into any type of plea agreement. Logically, then, the Court ought to provide a ruling on the validity of the sentencing guidelines. Counterbalanced with the pragmatic motivation for ruling on the guidelines, however, is the constitutionally mandated case or controversy requirement. *See* U.S. Const. art. III, § 2. The case or controversy requirement encompasses the concepts of standing and ripeness, both of which are prerequisites to judicial review. In the case before the Court, the defendants can

---

1. Only defendants Carlena, Julian, and Joseph Lawrence have objected to application of the guidelines.

demonstrate both standing and ripeness at this juncture; accordingly, Article III presents no barrier to resolution of the defendants' motions.

### A. Standing

■ Constitutional standing analysis requires a party to allege "some actual or threatened injury" before raising issues relating to the merits of a case. *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607–08, 60 L.Ed.2d 66 (1979). " '[A]bstract' or 'conjectural' or 'hypothetical' " injury is insufficient for the purpose of establishing standing. *See, e.g., Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Applying this standard, the Court finds that the defendants in the case at bar can demonstrate adequate "threatened injury" to support standing. As the district court reasoned in *United States v. Chambless,* 680 F.Supp. 793 (E.D.La.1988), criminal defendants subject to sentencing under the guidelines can show an "impending injury," which is sufficient to confer standing upon defendants seeking to attack the guidelines. *Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979). Likewise, any defendant who enters into a plea agreement necessarily is subject to sentencing under the guidelines; a defendant contemplating a plea offer therefore faces more than an "abstract" or "hypothetical" injury. *Cf Allen,* 468 U.S. at 751, 104 S.Ct. at 3324. Thus, the Court concludes that standing affords no impediment to disposition of the defendants' motions.

### B. Ripeness

■ In a manner similar to standing, the concept of ripeness is intended "to prevent the courts ... from entangling themselves in abstract disagreements." *Abbott Laboratories v. Garnder,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Ripeness, which focuses on "avoidance of premature adjudication," *id.,* requires consideration of two factors. First, the Court must address the "fitness of the issues for judicial decision." *See id.* at 149, 87 S.Ct. at 1515. Second, the Court must evaluate "the hardship to the parties of withholding court consideration." *Id.*

As Judge Enright observed in *United States v. Ruiz–Villanueva,* 680 F.Supp. 1411 (S.D.Cal.1988), the defendants' challenges involve "purely legal issues which do not require further factual development." *Id.* at 1415. Accordingly, the issues raised by the defendants in the case at bar are entirely fit "for judicial decision." With respect to the "hardship" factor, there can be no doubt that defendants contemplating plea agreements require a decision as to the validity of the guidelines if they are to make an intelligent and informed choice to plead guilty and thus forego their right to a jury trial. In sum, defendants' motions raise questions that undoubtedly are ripe for judicial consideration.

## II. CONSTITUTIONAL CHALLENGES TO THE SENTENCING GUIDELINES

The sentencing guidelines, which became effective on November 1, 1987, constitute a bipartisan [2] effort to "provide certainty and fairness" in the sentencing process and to alleviate "unwarranted sentencing disparities" among similarly situated defendants. 28 U.S.C. § 991(b)(1)(B). The guidelines are the product of the United States Sentencing Commission, which was created and empowered by Congress "as an independent commission of the judicial branch of the United States." *Id.* § 991(a). Because the defendants have interposed challenges to the nature, composition and product of the Commission, the Court will briefly review the substance of operative con-

---

**2.** The bipartisan nature of the Sentencing Reform Act, which was authored by Senators Kennedy and Thurmond, *see generally United States v. Johnson,* 682 F.Supp. 1033, 1038 n. 5 (W.D. Mo.1988), is evident both in the text of the Act and in the legislative history. *See, e.g.,* 28 U.S.C. § 991(a) ("Not more than four of the members of the Commission shall be members of the same political party."); S.Rep. No. 225, 98th Cong., 2d Sess. 160, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3343 ("Presidential appointments based on politics rather than merit would, and should, be an embarrassment to the appointing authority.").

gressional directives despite the well-documented abundance of explanatory judicial discourse on this subject. *See, e.g.,* 43 Crim.L.Rep. at 2122–27.

The Commission in question is comprised of a single chairperson, six additional voting members, and one nonvoting member. 28 U.S.C. § 991(a). Upon the recommendation of the Judicial Conference, *see* S.Rep. No. 225, 98th Cong., 2d Sess. 159, *reprinted in* 1984 U.S. Code Cong. & Admin.News 3182, 3342, "[a]t least three of the members [of the Commission] shall be federal judges." 28 U.S.C. § 991(a). Despite the statutory requirement concerning inclusion of federal judges, however, members of the Commission do not technically act in their capacity as judges while sitting on the Commission. *See* S.Rep. at 160, 1984 U.S. Code Cong. & Admin.News at 3343. All members of the Commission, including the chairperson, are appointed by the President with the "advice and consent of the Senate," 28 U.S.C. § 991(a), and are "subject to removal from the Commission by the President only for neglect of duty or malfeasance in office or for other good cause shown." *Id.*

The purposes of the Commission are quite simple in theory—to "establish sentencing policies and practices for the Federal criminal justice system" subject to extensive congressional directives and to "develop means of measuring the degree to which the sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing" as described in 18 U.S.C. § 3553(a)(2). *See* 28 U.S.C. § 991(b)(1) & (2). In furtherance of the Commission's stated function of promulgating sentencing guidelines, *see id.* § 994(a), Congress also provided the Commission with the power to "monitor the performance of probation officers with regard to sentencing recommendations," *id.* § 995(a)(9), to "issue instructions to probation officers concerning the application of Commission guidelines and policy statements," *id.* § 995(a)(10), and to "devise and conduct periodic training programs of instruction in sentencing techniques for judicial and probation personnel and other persons connected with the sentencing pro-

cess." *Id.* § 995(a)(18). Additionally, the Commission is charged with the responsibility of considering "any petition filed by a defendant requesting modification of the guidelines utilized in the sentencing of such defendant." *See id.* § 994(s). Section 994 further authorizes the Commission to recommend changes to the existing guidelines, although any proposed amendments must be reported to Congress before such amendments can become effective. *Id.* § 994(p). Proposed amendments can be "disapproved or modified," however, only "by Act of Congress." *Id.*

After the Sentencing Reform Act became effective, the Commission comprised of three federal judges and four other voting members developed the sentencing guidelines at issue in the case at bar. Defendants raise challenges to several aspects of the Act that created the Commission. First, defendants contend that section 994(a) provides for an impermissible delegation of Congress' lawmaking power to the Commission. Second, defendants argue that section 994(p)'s reporting and congressional action provision amounts to an unlawful legislative veto. Next, defendants turn to the Commission itself and urge the Court to declare that the placement of the Commission in the judicial branch coupled with presidential appointment and removal power constitutes a violation of the separation of powers doctrine. The Court will address these arguments individually to allow discussion of the legal consequences that flow from the Court's rulings on the various issues.

## A. The Relationship Between Congress and the Commission

To a limited extent, the Sentencing Reform Act constructs a system in which Congress and the Commission are interactive. Congress offered a great deal of guidance to instruct the Commission's creation of sentencing guidelines. *Cf.* 28 U.S. C. § 994. In addition, Congress included a reporting requirement in the Act. *See id.* § 994(p). In the final analysis, however, Congress vested a significant degree of

autonomy in the Commission as far as the development of guidelines is concerned.

### 1. Congressional Delegation of Power to the Commission

In challenging the Sentencing Reform Act as including an unlawful delegation of congressional power, the defendants necessarily raise Article I concerns coupled with delegation doctrine issues. *See* U.S. Const. art. I, §§ 1, 8; *see also A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529, 55 S.Ct. 837, 842–43, 79 L.Ed. 1570 (1935); Schoenbrod, *The Delegation Doctrine: Could the Court Give It Substance?*, 83 Mich.L.Rev. 1223, 1224 (1985) (defining delegation doctrine as "a limit in article I on Congress' power to delegate the power of legislation to other branches of government"). Defendants have presented the Court with a two-pronged attack based upon the delegation doctrine. First, defendants contend that the Sentencing Reform Act, in delegating to the Commission the authority to promulgate sentencing guidelines, prescribes a congressional transfer of a "core legislative function." *See, e.g., Ruiz-Villanueva*, 680 F.Supp. at 1416. Defendants also assert that the delegation of power to the Commission is unfettered by "intelligible principles," *see J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928), and thus is improper irrespective of whether Congress has the power to make such a delegation. *See, e.g. Chambless*, 680 F.Supp. at 795.

The defendants' argument concerning lack of congressional power to make such a delegation to the Commission relies on the Supreme Court's opinions in *Schechter* and *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). *Schechter* and *Panama Refining*, both New Deal era decisions, marked the zenith of the delegation doctrine's applicability. Soon after announcing *Schechter* in 1935, however, the Court retreated from its aggressive use of the delegation doctrine as a tool for limiting congressional delegation of authority. *See* J. Nowak, R. Rotuda & J. Young, Treatise on Constitutional Law: Substance and Procedure § 4.8, at 294 n. 4

(1986) ("Since 1936 no federal statute has been held unconstitutional by the Supreme Court because of an excessive delegation of legislative power.") In 1941, the Court decided *Opp Cotton Mills v. Administrator of Wage & Hour Division*, 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624 (1941), which proved to be a harbinger of the delegation doctrine's demise. Upholding a delegation of standard-setting authority to an executive branch administrator, the *Opp Cotton Mills* Court reasoned that "[i]n an increasingly complex society Congress obviously could not perform its functions if it were obliged to find all the facts subsidiary to the basic conclusions which support its defined legislative policy." *Id.* at 145, 61 S.Ct. at 532. The erosion of the delegation doctrine continued in 1944 with the Supreme Court's decision in *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). The *Yakus* Court, unpersuaded that Congress had unconstitutionally delegated its legislative power to control prices, stated: "The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct.... These essentials are preserved when Congress has specified the basic conditions of fact upon whose existence or occurrence, ascertained from relevant data by a designated administrative agency, it directs that its statutory command shall be effective." *Id.* at 424–25, 64 S.Ct. at 667.

The progression of delegation doctrine decisions clearly indicates that while *Schechter* and *Panama Refining* cannot simply be discarded as aberrations, *cf. National Cable Television Ass'n v. United States*, 415 U.S. 336, 353, 94 S.Ct. 1146, 1156, 39 L.Ed.2d 370 (1974) (Marshall, J., dissenting), the scope of the delegation doctrine "must be determined on the basis of the deferential post-*Schechter* cases decided by the Supreme Court." *Synar v. United States*, 626 F.Supp. 1374, 1384 (D.D.C.) (three-judge panel including Scalia, J.), *aff'd on other grounds sub nom. Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); see also *Humphrey v. Baker*, 848 F.2d 211, 217 (D.C.Cir.1988). The

deferential standard employed in *Opp Cotton Mills* and *Yakus*, which has served as the benchmark for delegation doctrine scrutiny since the New Deal era, unmistakably demonstrates that Congress has not impermissibly delegated a "core legislative function" by enacting the Sentencing Reform Act. *See, e.g., United States v. Arnold*, 678 F.Supp. 1463, 1466–67 (S.D.Cal.1988). The Court, therefore, finds that the only possible delegation doctrine impediment to constitutionality is the broad "intelligible principles" requirement. *See, e.g., Ruiz-Villanueva*, 680 F.Supp. at 1416–17 (rejecting "core functions" argument and undertaking "intelligible principles" inquiry); *United States v. Johnson*, 682 F.Supp. 1033 (W.D.Mo.1988) (providing extensive discussion of delegation doctrine argument); *but see United States v. Tolbert*, 682 F.Supp. 1517, 1522 (D.Kan.1988) (arguing for revival of delegation doctrine to strike down Sentencing Reform Act.)

■ The "intelligible principles" aspect of the delegation doctrine maintains that Congress cannot delegate authority without also offering guidance to assist the recipient of the delegated power. *See, e.g., National Cable Television*, 415 U.S. at 342, 94 S.Ct. at 1149–50 (quoting *Hampton & Co.*). Courts, however, are "justified in overriding [Congress'] choice of means for effecting its declared purpose ... only if ... there is an absence of standards ..., so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Yakus*, 321 U.S. at 426, 64 S.Ct. at 668. In the case of the Sentencing Reform Act, Congress has provided ample guidance to direct the Commission in exercising its delegated power. *See, e.g.*, 28 U.S.C. §§ 991, 994; *cf. Chambless*, 680 F.Supp. at 796–97. Accordingly, the Court finds that Congress' delegation of authority to the Commission passes constitutional muster in the face of defendants' delegation doctrine challenge.

**2. Congressional Retention of Power**

■ Relying on the Sentencing Reform Act's reporting requirement and allowance for congressional disapproval or modification of all Commission action concerning guidelines, *see* 28 U.S.C. § 994(p)), defendants assert that Congress has impermissibly retained the type of legislative veto proscribed in *Immigration and Naturalization Serv. v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). The Court disagrees with the characterization of congressionally retained power urged by the defendants; the Supreme Court's decision in *Chadha* does not mandate a finding that the Sentencing Reform Act's reporting provision is unconstitutional.

In *Chadha*, the Supreme Court explicitly indicated that the constitutional limitations of bicameralism and presentment prohibit congressional retention of a legislative veto for the purpose of controlling the exercise of congressionally delegated powers. *See Chadha*, 462 U.S. at 957–59, 103 S.Ct. at 2787–88. Thus, if Congress were to require the Commission to report proposed amendments that would be subject to rejection upon disapproval of the House or the Senate, the Court would have to strike such a provision as an impermissible legislative veto. Both the text of the Sentencing Reform Act and the legislative history indicate, however, that Congress has not reserved such a legislative veto. Rather, congressional disapproval or modification of Commission action must be "by Act of Congress." 28 U.S.C. § 994(p). The legislative history substantiates the Court's conclusion that this provision means what it says—that Congress cannot override Commission activity absent compliance with the bicameral requirement and presentment to the President. *See* S.Rep. at 178, 1984 U.S. Code Cong. & Admin.News at 3361. Because the reporting requirement is innocuous based on Section 994(p)'s "Act of Congress" requirement, it does not implicate the constitutional concerns addressed in *Chadha*. The Court, therefore, finds defendants' legislative veto argument to be specious.

**B. Separation of Powers**

Defendants next challenge the Sentencing Guidelines as violative of the constitutional separation of powers doctrine. This challenge stems from a combination of the

placement of the Commission within the judicial branch of government, the assignment to it of quasi-legislative duties, and the delegation of removal power to the President. The government takes the position that this combination of functions between the judicial and executive branches violates separation of powers principles. One of the solutions proposed by the government is that the Court simply ignore the judicial branch "label" and treat the Commission either as within the executive branch or as an independent agency. The problem with this approach is that Congress' intention to place the Commission within the judicial branch is clear from both the express language of the Sentencing Reform Act and its legislative history.

Section 991(a) provides that the Sentencing Commission is "an independent commission in the judicial branch of the United States." That there was method to this language is evident from the Senate Report, which states that the "[p]lacement of the Commission in the judicial branch is based on the Committee's strong feeling that, even under this legislation, sentencing should remain primarily a judicial function." S.Rep. at 159, 1984 U.S.Code Cong. & Admin.News at 3342. The intended judicial nature of the Commission is further evidenced by the fact that *at least* three of the seven voting members of the Commission *must* be federal judges. 28 U.S.C. § 991(a). In fact, as many as six of the seven voting positions conceivably could be filled by judges. *See id.* (at least three judges selected from a list of six). The only other mandated member, the Attorney General or his designee, serves in a nonvoting capacity. Additionally, the Commission is invested with the power to issue instructions to probation officers, *id.* § 995(a)(10), who are members of the judicial branch. Finally, one of the congressional justifications for utilizing active federal judges on a full-time basis without requiring them to resign their appointments as judges, *id.* § 992(c), is that the Commission operates as part of the judiciary. S.Rep. at 163, 1984 U.S. Code Cong. & Admin.News at 3346. Congress apparently felt that the use of judges in this way on a nonjudicial

commission would raise constitutional difficulties.

The underlying purpose of the separation of powers doctrine is to prevent the concentration of executive, legislative and judicial power within a single, and potentially tyrannical, branch of government. *See, e.g.,* The Federalist No. 47, at 326 (J. Madison) (J. Cooke ed. 1961). "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). The separation of powers doctrine may be violated in two ways: 1) when one branch prevents or interferes with another branch's fulfillment of its constitutionally assigned function; or 2) when one branch assumes power constitutionally allocated to another branch. *Chadha,* 462 U.S. at 963, 103 S.Ct. at 2790 (Powell, J., concurring); *Buckley v. Valeo,* 424 U.S. 1, 122–23, 96 S.Ct. 612, 683–84, 46 L.Ed.2d 659 (1976). Defendants' multifaceted attack upon the guidelines implicates each of these possibilities.

### 1. Interference with the Judicial Function

■ Defendants contend that the mandatory presence of federal judges on the Commission interferes with the judiciary's Article III responsibilities of deciding "cases" or "controversies." That the inclusion of judges on the Commission was at the request of the Judicial Conference of the United States, however, belies such "interference." S.Rep. at 159, 1984 U.S. Code Cong. & Admin.News at 3342. Moreover, no particular judge is forced to serve on the Commission. Each judge does so voluntarily and, the Court suspects, eagerly. The Third Circuit emphasized the voluntariness of a judge's service on the President's Commission on Organized Crime in rejecting a constitutional challenge based on separation of powers. *In re President's Commission on Organized Crime,* 783 F.2d

370, 376 (3rd Cir.1986). The court also found the nonjudicial nature of the work to be significant in holding that "Congress may impose some extrajudicial duties on Article III judges individually—duties that under the separation of powers may not be imposed on the courts *qua* courts." *Id.* at 375–76. The Court agrees with those cases finding that the service on the Commission of between three and six out of over 900 federal judges does not unconstitionally interfere with the performance of the judiciary. *See, e.g., United States v. Alves,* 688 F.Supp. 70, 76 (D.Mass.1988).

The second aspect to the "interference" argument is that service by judges on the Commission undermines the impartiality of the judiciary and places a judicial stamp of approval on the guidelines. Service on the Commission is different, however, from service on the President's Commission on Organized Crime or judicial involvement in the appointment of an independent counsel, each of which "undermines the status of the judiciary as a neutral forum for the resolution of disputes between citizens and their government." *In re Sealed Case,* 838 F.2d 476, 516 (D.C.Cir.1988) (independent counsel); *Application of President's Commission on Organized Crime,* 763 F.2d 1191 (11th Cir.1985) (service on President's Commission unconstitutional); *but see In re President's Commission,* 783 F.2d 370 (3rd Cir.1986) (service on President's Commission constitutional). As the Eleventh Circuit reasoned, "[a] judge who is charged with assisting and improving enforcement efforts against organized crime must adopt a progovernment perspective which is ill-suited to his obligation to be neutral in the courtroom." *Application,* 763 F.2d at 1197. Similarly, the appointment of the independent counsel under the Ethics in Government Act impermissibly involves an Article III court in the inherently executive duty of prosecuting criminal cases. *Sealed Case,* 838 F.2d at 516. Not only does such participation interfere with the proper

functioning of the judiciary, but it also impermissibly transfers a core domain of executive power—law enforcement—to the judiciary.

By contrast, the imposition of a criminal penalty historically has been allocated between the judicial and legislative branches. While Congress retains the power to create mandatory sentences, it frequently sets a maximum, and sometimes also a mandatory minimum, penalty and leaves a great deal of discretion to the courts. In this context, it is difficult to argue that judicial participation in creation of the guidelines undermines the impartiality of the judiciary. After all, Congress intended that sentencing "remain primarily a judicial function." S.Rep. at 159, 1984 U.S.Code Cong. & Admin.News at 3342. Given the prevalent and often caustic disagreement among judges on every issue imaginable, it is unrealistic to assume that the mere fact that three federal circuit judges [3] were involved in promulgating the guidelines will have any bearing whatsoever with respect to their judicial treatment. Accordingly, the service of judges on the Commission does not unconstitutionally interfere with the functioning of the judiciary.

### 2. Assumption of Power by the Judiciary

The Sentencing Commission performs functions similar to rulemaking undertaken by administrative agencies within the executive branch.[4] Both the government and the defendants take the position that such "executive functions" cannot be performed by a Commission within the judicial branch. In addition, several district courts have classified the promulgation of the guidelines as executive in nature. *See, e.g., United States v. Chambless,* 680 F.Supp. 793, 800–01 (E.D.La.1988) (citing *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986)). In *Bowsher,* the Supreme Court concluded that the duties of the Comptroller General are executive in

---

**3.** The Court notes in passing that no Supreme Court Justices were involved in promulgating the guidelines.

**4.** The legislative history indicates that 28 U.S.C. § 994(w) creates an exception to 5 U.S.C. § 551(1)(B) of the Administrative Procedures

Act, which would otherwise prevent the application of the rulemaking requirements of the APA, *id.* § 553, to judicial branch entities. S.Rep. at 180, 1984 U.S.Code Cong. & Admin.News at 3363.

nature: "Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." 478 U.S. at 733, 106. S.Ct. at 3192. It is true that the work of the Commission is "executive" in a broad sense, in that the guidelines are fashioned pursuant to and in furtherance of enabling legislation. However, administrative agencies typically perform executive, legislative, and judicial functions. *See, e.g.,* 1 K. Davis, Administrative Law Treatise §§ 2.2–2.4 (1984). In his concurring opinion in *Buckley v. Valeo,* Justice White recognized that "the development of the administrative agency in response to modern legislative and administrative need has placed severe strain on the separation-of-powers principle in its pristine formulation. Any notion that the Constitution bans any admixture of powers that might be deemed legislative, executive, and judicial has had to give way." 424 U.S. at 280–81, 96 S.Ct. at 755 (White, J., concurring) (citation omitted).

In analyzing the separation of powers doctrine, the Supreme Court has distinguished between the exercise of an executive function and the wielding of executive power. *Ameron v. United States Army Corps of Engineers,* 809 F.2d 979, 991 (3rd Cir.1986) (quoting *Humphrey's Executor v. United States,* 295 U.S. 602, 628, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935)). Only the latter may not be exercised by the judicial and legislative branches. As the Court explained in *Humphrey's Executor:*

> To the extent that [the FTC] exercises an executive function—as distinguished from executive power in the constitutional sense—it does so in the discharge and effectuation of its quasi legislative or quasi judicial powers, or as an agency of the legislative or judicial departments of the government.

295 U.S. at 628, 55 S.Ct. at 874. The *Humphrey's Executor* Court found that the Federal Trade Commission is not "an arm or an eye of the executive" because, while it effectuates legislative policies, it does not reside in the executive department nor does it exercise executive power vested solely in the President by the Constitution. *Id.* Similarly, "rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 213–14, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976). This is true because the rulemaking power cannot go beyond the limits of the enabling legislation and, as previously discussed, must be guided by "intelligible principles." Although the Supreme Court has taken a flexible "common sense" approach to separation of powers, where one branch has "sought to assume power *central* to another branch, the Court has not hesitated to enforce the doctrine." *Chadha,* 462 U.S. at 962–63, 103 S.Ct. at 2790 (emphasis added);[5] *see e.g., Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality) (grant of Article III jurisdiction to Article I bankruptcy court unconstitutional); *see* 1 Davis, *supra,* § 2.2, at 64 (main judicial power in courts; main executive power in President; main legislative power in Congress).

■ Turning to the case at bar, the Court finds that placement of the Sentencing Commission within the judicial branch does not violate separation of powers because the Commission does not wield "executive power." The Commission has no power over executive branch officials, nor has it undertaken to perform duties delegated by Congress to the executive. It must be remembered that the nature and extent of the executive duty "to take care that the laws are faithfully executed," U.S. Const. art. I, § 3, depends in large part on the content of those laws. *Bowsher,* 478 U.S. at 733, 106 S.Ct. at 3192 ("content of the Act determines the nature of the executive duty"); *see Myers v. United States,* 272 U.S. 52, 177, 47 S.Ct. 21, 46, 71 L.Ed. 160 (1926) (Holmes, J., dissenting) ("The duty of the President to see that the laws be executed is a duty that does not go beyond the laws

---

**5.** The Supreme Court has found a violation of the separation of powers doctrine most often where power has been assumed or interfered with contrary to an express constitutional provision. Note—Tomkowiak, 32 Wayne L.Rev. 151, 184–85 (1985).

or require him to achieve more than Congress sees fit to leave within his power."). *Bowsher* and *Chadha* make clear that once Congress delegates authority to the executive branch to implement legislation, Congress must abide by its own delegation and may not retain the power to control the execution of the laws without revoking the delegation through new legislation, which entails bicameral passage and presentment to the President. *Bowsher*, 478 U.S. at 726, 106 S.Ct. at 3189; *Chadha*, 462 U.S. at 954–55, 103 S.Ct. at 2786; *see Ameron*, 809 F.2d at 993–94. On the other hand, Congress may in the first instance either reserve to itself the power to implement legislation or delegate such authority to the judicial branch. *Ameron*, 809 F.2d at 990–91. Indeed, in *Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941), the Supreme Court upheld congressional delegation of authority to the Court for the purpose of adopting the Federal Rules of Civil Procedure. Id. at 10, 61 S.Ct. at 424–25. Although *Sibbach* is often distinguished on the basis that it involves only "procedural" rules whereas the guidelines amount to substantive rulemaking, this distinction goes to the propriety of the delegation rather than the usurpation of executive power by the judiciary. Like the Supreme Court in *Sibbach* and the Federal Trade Commission in *Humphrey's Executor*, the Sentencing Commission is not an instrument of the executive branch and exercises no "executive power in the constitutional sense." Congress has chosen not to entrust the promulgation of the guidelines to the executive. In fact, the House Report indicates that Congress perceived constitutional difficulties in allowing the executive branch to do so. H.R.Rep. No. 1017, 98th Cong., 2d Sess. 95. Thus, the placement of the Sentencing Commission within the judicial branch does not violate separation of powers.

### 3. Assumption of Power by the Executive

■ The fact that the Commission is clearly an instrument of the judicial branch, however, underscores the problem of giving the President the power of removal. Section 991(a) provides that the President may remove members of the Commission for "neglect of duty," "malfeasance," or for "other good cause." The Supreme Court spoke to the constitutional infirmity of allowing one branch of government to have broad power to remove officials who exercise powers delegated to another branch in *Bowsher*. The statute in *Bowsher* authorized Congress to remove the Comptroller General, who exercised executive functions pursuant to a legislative delegation, for among other things "neglect of duty" or "malfeasance." Reasoning that "[t]hese terms are very broad and, as interpreted by Congress, could sustain removal of a Comptroller General for any number of actual or perceived transgressions of the legislative will," the Court held that the removal provision violates separation of powers. 478 U.S. at 729, 106 S.Ct. at 3190. The nebulous "good cause" standard in the present statute arguably provides an even broader power of removal. As the Supreme Court recognized in *Bowsher*, "[i]n constitutional terms, the removal powers over the [Sentencing Commission] dictate that [it] will be subservient to [the President]." Id. at 730, 106 S.Ct. at 3191. Under the authority of *Bowsher*, then, the Court finds this type of situation to be an unconstitutional assumption of power by the executive.

### 4. Severability

■ Having found the removal provision of the Act to be unconstitutional, the Court must determine whether that provision may be severed from the remainder of the statute. The Court notes at the outset that the Sentencing Reform Act does not contain an express severability clause. Congressional silence on the issue, however, does not defeat severability. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, ___, 107 S.Ct. 1476, 1481, 94 L.Ed.2d 661 (1987). On the contrary, there is a presumption in favor of severability. *Regan v. Time, Inc.*, 468 U.S. 641, 653, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984). " 'Unless it is evident that the Legislature would not have enacted those provisions which are within its

power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.' " *Id.* (quoting *Buckley v. Valeo,* 424 U.S. at 108, 96 S.Ct. at 677). Courts have a duty to salvage as much of a statute as is possible consistent with both the Constitution and the intent of the legislature. *Regan,* 468 U.S. at 652, 104 S.Ct. at 3268–69.

In this case, the removal provision of section 991(a) must be severed unless the Court concludes that Congress would not have enacted the Sentencing Reform Act without that provision. The Court recently explained in *Alaska Airlines,* in the context of a legislative veto, that "[s]ome delegations of power … may have been so controversial or so broad that Congress would have been unwilling to make the delegation without a strong oversight mechanism." 480 U.S. at ___, 107 S.Ct. at 1481. Similarly, the President's power of removal represents executive oversight of the Commission. Thus, the critical inquiry is whether Congress would not have enacted the Sentencing Reform Act but for postappointment executive oversight of the Commission. Upon a review of the legislative history, the Court cannot conclude that Congress contemplated, must less required, executive oversight of the Commission. All references are to the contrary. *See* S.Rep. at 160, 1984 U.S.Code Cong. & Admin.News at 3343 ("Presidential appointments based on politics rather than merit would, and should, be an embarrassment to the appointing authority."), *id.* at 181, 1984 U.S.Code Cong. & Admin.News at 3364 ("There is ample provision for review of the guidelines by the Congress and the public; no additional review of the guidelines as a whole is either necessary or desirable."). Additionally, the Attorney General's participation on the Commission is in a nonvoting capacity. Even the President's appointment power is somewhat circumscribed by requiring consultation with various groups, for the purpose of obtaining "a broadly representative membership." *Id.* at 159, 1984 U.S.Code Cong. & Admin.News at 3342. Therefore, the Court concludes that the provision of the Sentencing Reform Act giving the President the power of removal is severable from the remaining constitutional portions of the Act.

## III. STATUTORY CHALLENGES TO THE SENTENCING GUIDELINES

■ Despite the Court's determination that the sentencing guidelines need not be invalidated on constitutional grounds, defendants contend that the guidelines must be struck because they conflict with the enabling legislation in the Sentencing Reform Act. Specifically, defendants argue that the guidelines improperly preclude courts from utilizing the option of probation in cases involving nonviolent first offenders, *cf.* 28 U.S.C. § 994(j), incorrectly fail to account for prison overpopulation that allegedly will flow from application of the guidelines, *cf. id.* § 994(g), and inappropriately mandate supervised release and a fine in each case involving a term of imprisonment in excess of one year. *Cf.* 18 U.S.C. §§ 3571(a), 3583(a). These arguments are neither novel nor persuasive; courts faced with these statutory challenges have uniformly rejected the positions urged by the defendants. *See, e.g., Chambless,* 680 F.Supp. at 802; *United States v. Smith,* 686 F.Supp. 1246, 1253–54 (W.D.Tenn.1988); *United States v. Erves,* No. CR87–478A, slip op. at 1–2 (N.D.Ga. March 22, 1988) (adopting position of government brief on statutory challenges).

The argument that the Sentencing Reform Act requires probation for first offenders in all cases other than those involving crimes of violence is specious. If the Court were to adopt the defendants' interpretation of 28 U.S.C. § 994(j), congressional preclusion of probation for first offenders who commit "otherwise serious offense[s]" would be wholly superfluous. *Cf. Smith,* 686 F.Supp. at 1253. Likewise, defendants' contention that the guidelines fail to account for prison overcrowding is meritless. Defendants' unsupported, speculative concern about overcrowded prisons is readily assuaged by the Commission's ability to "make recommendations concerning any change *or expansion* in the nature or capacity of such facilities and services

that might become necessary as a result of the guidelines." *See* 28 U.S.C. § 994(g) (emphasis added). Finally, defendants' assertion that the Commission cannot promulgate guidelines requiring fines and supervised release terms is contradicted by the statutory language on which the defendants rely. Sections 3571 and 3583 of Title 18 clearly state that fines and supervised release terms *"may"* be included as a part of sentences. *See* 18 U.S.C. §§ 3571(a), 3583(a). Accordingly, the Court need not strike the guidelines based on any conflict with Title 18. Because the Court finds no merit in defendants' statutory arguments, the sentencing guidelines must control the sentencing process in the cases at bar.

The sentencing guidelines promulgated by the United States Sentencing Commission, therefore, are fully applicable in this case. Thus, defendants' motions to preclude application of the guidelines will be denied by an appropriate order.